UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
UNITED STATES OF AMERICA,

                                                    **MEMORANDUM &
                                                    ORDER OF RESTITUTION**

                    -against-
                                                    98 CR 1129 (RJD)

ROY AGELOFF,

                              Defendant.
-------------------------------------------------------X

DEARIE, District Judge.

    This matter is before me on remand from the Second Circuit. In <u>United States v.
Catoggio</u>, 326 F.3d 323 (2d Cir.), <u>cert. denied</u>, 540 U.S. 939 (2003), the Circuit vacated the
restitution portion of Defendant Roy Ageloff's sentence, and returned the matter to me for
resentencing on restitution only.[1]

## I.    BACKGROUND

### A.    Ageloff's Criminal Conduct

    The fraudulent securities schemes carried out by Ageloff and his co-conspirators were
massive, aggressive, and extremely lucrative. The Second Circuit's <u>Catoggio</u> decision, drawing
upon the Presentence Report prepared by the Department of Probation, recounts the basic
underlying facts, <u>see</u> 326 F.3d at 324-26, sparing the need for extensive restatement here. In the
context of this restitution remand, however, I underscore that Ageloff's illegal profits came, as
the Circuit recognized, "*at the expense of unwary consumers*." <u>Catoggio</u>, 326 F.3d at 324
(emphasis added). To be sure, Ageloff engaged in what is called "market manipulation," but that
sanitizing label can obscure the fact that the sine qua non of fraud is a *victim*. Ageloff's crime

---

[1] The parties' familiarity with all prior proceedings in this matter and the arguments
advanced in the numerous sentencing-related submissions is assumed.

was committed *against* unsuspecting individual investors, indeed scores of them.  It is they who were lied to, their money and financial security that was stolen, and to them that long overdue amends are being ordered.

The scheme was of the straightforward "pump and dump" variety:  relentlessly predatory and remarkably effective.  In essence, once Ageloff and his cohorts managed to acquire control of blocks of "house stocks" (which included "companies that did no business at all," id.), the success of their scheme was realized through the lies they relentlessly told investors.  Brokers "used high-pressure sales tactics" and "aggressively tout[ed]" the worthless house stocks to the public, id. at 325; the brokers were "encouraged" to do so by the large commissions they were paid, a fact they withheld from the customers, who were "routinely informed [ ] that a nominal commission or no commission would be charged."  Id.  Additionally, Ageloff's team "used  . . . misleading statements to persuade customers not to sell house stocks."  Id.  Among other things, Ageloff's brokers "would praise the business prospects of the house stock companies, even though many of the companies did little or no business and would assure their customers that the price of the house stocks would rise rapidly."  Id.  Then, "[t]o maintain the appearance of demand, brokers would often either fail to take and execute customer orders to sell house stocks or execute such a sale only if it could be 'crossed' with a purchase of the same stock by another customer."  Id.

Having succeeded in artificially inflating the price of house stocks, Ageloff and his cohorts would reap their profits by selling off their shares of those stocks to their own unsuspecting customers.  They would then endeavor to maintain the price of the house stocks so that that scheme would remain undetected and a large supply of additional unsuspecting customers would be available for the next round of sales of the inflated stock.

The criminal resolve manifest in the scheme was seemingly implacable: Ageloff's fraud began in 1991 while he was at the brokerage firm Hanover Sterling and continued there until the FBI raided the firm and closed it down in February of 1995. But Hanover's collapse did not deter him; Ageloff simply relocated his criminal operation, repeatedly (to Norfolk Securities, PCM Securities and Capital Planning Associates), until it finally and fully unraveled in mid-1998.

Ageloff was both architect and enforcer. Along with co-defendant Robert Catoggio he orchestrated the scheme, but he was its single most important participant. More than anyone else, it was Ageloff who developed the sham companies whose stocks became the touted "house stocks," who determined the allocation of the IPO house stocks to the brokers, who gave daily on-site pep talks to the brokers (and whose "motivational" tactics were often laced with threats of violence), who was *the* go-to person at Hanover, and who continued to be the financial point person even after Hanover's collapse.

Ageloff also earned the largest share of the tens of millions of dollars in illegal profits generated by the scheme.[2]

## B. The Initial Restitution Order

Ageloff entered a plea of guilty to a single count of a 34-count superseding indictment that charged him and 55 co-conspirators with engaging in a pattern of racketeering activity in

---

[2] During the years he carried on the fraud, Ageloff *declared* total income in excess of $17 million; by comparison, Ageloff declared income of approximately $350,000 for the three years immediately preceding fraud. The figure of $17 million undoubtedly understated the amount that Ageloff stole by millions, if not tens of millions, of dollars. For example, despite declaring income of $5,391,418 for 1994 and income of $3,313,500 for 1996, Ageloff declared income of only $539,865 for 1995; defense counsel clarified at Ageloff's sentencing that his client was in the process of amending his tax return for 1995. Further, there is no dispute that Ageloff created several offshore accounts and even his defense counsel admitted at Ageloff's sentencing that he had great difficulty in "getting Ageloff to sit down and do his financial statement."

violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and 1963.  I imposed a custodial sentence of 96-months and ordered restitution under the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A.  The Restitution Order specifically provides, in pertinent part, that Ageloff "shall pay restitution to the victims of the offense of conviction . . . in the amount of $80 [million]" and that Ageloff "shall be jointly and severally liable" for the full amount with co-defendant Robert Catoggio.

I adopted the amount of $80 million because it was the loss figure used at the time in both Ageloff's plea agreement and the Presentence Report prepared by the Probation Department in November 2000 (PSR).  In the former, Ageloff stipulated to a sentence enhancement of 18 levels pursuant to U.S.S.G. § 2F1.1(b)(1)(S) for fraud that caused losses in excess of $80 million, the highest loss bracket under the applicable 1997 Sentencing Guidelines; in the latter, Probation determined that, for guideline purposes, Ageloff was responsible for losses of more than $80 million.  Ageloff, of course, was also amply heard on the subject, and the restitution order issued only after plenary consideration of his extensive sentencing submissions, which included the recommendations of a retained loss calculation expert.  (As discussed more fully in the Findings section of this Memorandum, Ageloff's pre-sentencing papers advanced—and I already resolved—essentially the same arguments on loss that are asserted in Ageloff's extensive post-remand submissions).

On the specific subject of restitution, the plea agreement stated that restitution was "applicable" and that it would be ordered "in an amount to be determined by the Court."  When accepting Ageloff's plea, I also made clear that my intention at sentencing would be to impose restitution "to the extent that specific victims can be identified."  The November 2000 PSR explained that "[d]ue to the thousands of victims affected by the defendants' conduct, it would be

impractical to request Affidavits of Loss from each victim, but it is noted that the Government is in possession of trading records which identify the victims and their respective losses." As the Catoggio decision notes, at the time of Ageloff's sentencing the following August, the government had not yet provided me with a list of identified victims and actual losses. There was no dispute, however, that there was a basis for the figure of at least $80 million; further, as Catoggio also notes, Ageloff had "acknowledged on the record that he had agreed with the government that the required victim information could be provided at a date beyond the 90 days specified in 18 U.S.C. § 3664(d)(5)." Id., 326 F.3d at 325. Accordingly, I included the following language in the Restitution Order:

> By the consent of the parties, the names of the victims to whom restitution is owed and the losses sustained by each individual victim will be set forth in a separate Order of the Court at such time, which may exceed 90 days from the date of this Order, as that information can be ascertained by the Court, on notice to the defendant, based on a proposal that shall be submitted by the United States Attorney.[3]

## C.      The Circuit's Remand

In affirming Ageloff's conviction, the Circuit rejected all but one of Ageloff's objections to the Restitution Order as "at best a disingenuous effort to avoid a consequence of his criminal behavior." Catoggio, 326 F.3d at 328. More specifically, the Court rejected Ageloff's contention that the victims of his crime were "unidentifiable," pointing to the fact that the government had, by the time of oral argument on the appeal, submitted to me a lengthy report of victims' identities. Id. at 327-28. (I address this report in the Findings section of this

---

[3] I also imposed the following payment schedule: $500,000 within 30 days of sentencing, another $500,000 within 30 days of Ageloff's release from prison, and $10,000 per month thereafter as a condition of supervised release. The Court in Catoggio rejected Ageloff's argument that I failed to consider the required factors outlined in Section 3664(f)(2) before setting this restitution schedule, and concluded that there was no error in my determination of that schedule. 326 F.3d at 328.

Memorandum, *infra* at 12 et seq.). The Circuit also rejected Ageloff's argument under 18 U.S.C. § 3663A(c)(3) that the number of victims was too large for restitution to be practicable and that the issues in determining restitution were so complex that the need for restitution was outweighed by the burden on the sentencing process. Id.[4] To the contrary, the Circuit recognized that I had "considered restitution an essential part of [Mr.] Ageloff's sentence," that I did not "commit[] plain error in proceeding with restitution in this admittedly complex case," and that the Restitution Order "represents a creative approach to a difficult problem." Id. at 328, 327.

The Circuit held, however, that "even where a defendant's complex fraud scheme results in many victims whose identities and losses are difficult to ascertain, [a] district court should identify the victims and their actual losses *prior to* imposing restitution under the MVRA." Id. at 329 (emphasis added). As the Circuit explained, restitution under the MVRA "can only be imposed to the extent that the victims of a crime are *actually identified*," and so the Court concluded that "although [the Court] believe[s] the victims of Ageloff's fraud are identifiable," I "erred in not identifying them before ordering restitution." Id. at 328 (emphasis added).

The Catoggio decision also reflects the Circuit's concern that the figure of $80 million may have been inappropriately low. The Court noted that "the MVRA also requires courts to order restitution in the *full amount* of the victims' losses," id. at 329 (emphasis added) (citing 18

_____

[4] Section 3663A(c)(3) provides:

(3) This section shall not apply in the case of an offense described in paragraph (1)(A)(ii) if the court finds, from facts on the record, that--

(A) the number of identifiable victims is so large as to make restitution impracticable; or

(B) determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

U.S.C. § 3664(f)(1)(A)), and that, although the figure of $80 million set the appropriate upward

enhancement to the length of Ageloff's incarceration, neither the parties nor I indicated that the

figure "was an estimate of actual loss." Id.  Indeed, the Court was aware that the government's

post-sentencing Restitution Report now placed actual losses in the $190 million range while

Ageloff was contending that the figure was "significantly less" than $80 million, but that, by his

explicit agreement to the sentencing enhancement, "[Mr.] Ageloff admitted to causing losses

*exceeding* $80 million." Id. (emphasis in original).  See also United States v. Qurashi, 634 F.3d

699, 703 (2d Cir. 2011) ("We think it significant that the statute mandates that courts 'order

restitution to each victim in the *full amount* of each victim's losses'") (quoting § 3664(f)(1)(A),

emphasis added by the Circuit).

        Finally, the Circuit noted that "proceedings" to determine the victims and actual losses

were then "under way in the district court," and, in remanding "for resentencing on restitution,"

instructed me to "simply incorporate the findings from those proceedings into a new restitution

order." Id. at 330.

        Under Catoggio, then, my task here is an exceedingly limited one: to compile, and then

incorporate into a supplemental restitution order, a list of the names of actually identified victims

and the total loss that each victim suffered.

**D.      The Florida Conviction**

        Ageloff's efforts to avoid paying restitution have hardly been confined to this Court.

They have also been manifest in the additional criminal activity Ageloff undertook from the very

prison cell where he has been serving the sentence I imposed.  As revealed through the

proceedings commenced by indictment number 5:08-cr-32-Oc-10GRJ handed down by a federal

grand jury in the Middle District of Florida, Ageloff enlisted the services of his brother Michael

Ageloff to help him conceal from the government illegal proceeds of the pump and dump schemes that were the subject of his conviction here. In 2008, Ageloff entered a plea of guilty to one count of conspiracy to commit money laundering.

Although he acknowledges, as he must, the fact of his guilty plea, Ageloff insists that his Florida criminality has no bearing on this proceeding. The plain language of the Florida indictment refutes Ageloff's position: after making specific reference to the indictment, guilty plea, sentence and restitution order *in this case*, <u>see</u> *Fla. Ind.* At ¶¶ 1-6, the indictment charges that Ageloff conspired with others to engage in transactions "designed in whole or in part to conceal and disguise the nature, location, the source, ownership and control of the proceeds" of the conduct for which he was convicted in this Court, and that "[i]t was part of the conspiracy" that Ageloff and others "agreed to undertake efforts to conceal the money and other assets that [Ageloff] had obtained as a result of [that] securities fraud." *Fla. Ind.* at ¶¶ 9, 10.

The transcripts of Ageloff's plea and sentencing proceedings in Florida likewise flatly refute Ageloff's claim in this proceeding that the Florida conviction did not reflect his effort to avoid paying restitution: In its proffer of facts during the plea proceeding, the government recited, *inter alia*, that "from 1991 to 1998 Roy B. Ageloff was involved in a stock or securities manipulation scheme whereby he swindled thousands of investors out of millions of dollars," for which he pled guilty to one count of a 34-count superseding indictment in this Court, and that, while in federal custody on that conviction, he gave others "instructions regarding the . . . transfer [and] concealment . . . of the profits he obtained through securities fraud." Plea Tr. Jan. 8, 2009 at 25, 30. The following ensued:

> The Court: Now, Mr. Ageloff, you just heard what the government says happened. And let me first ask you, generally, is that, indeed, what you did in this case?
>
> [Ageloff]: Yes. (*Plea Hearing*, 5:08-cr-32-0c-10GRJ, January 8, 2009 at 25, 30).

At sentencing, the following exchange occurred:

The Court:    Mr. Ageloff, do you then admit that in your conversations
              with your brother while you were at Coleman between
              November 2001 and October 2003 that it was your intent
              not only to manage the investment and disbursement or
              distribution of funds that you had derived from your
              securities fraud activities in New York but to conceal those
              funds from the United States?

[Ageloff]:    Yes. (*Sentencing Hearing*, 5:08-cr-32-0c-10GRJ, July 22, 2009 at 27-28).

## II.    DISCUSSION

### A.    Legal Standards

The general standards governing restitution are not in dispute and do not require lengthy

recitation here, except perhaps to note that they have not changed since the mandate was issued

in Catoggio.  Thus, as Catoggio notes and the parties recognize, the "primary and overarching

purpose of the MVRA is to make victims of crime whole, to fully compensate these victims for

their losses and to restore these victims to their original state of well-being."  United States v.

Boccagna, 450 F.3d 107, 115 (2d Cir. 2006) (citation and quotation marks omitted).  In addition

to compensating victims, restitution is also designed to serve the traditional purpose of forming a

part of the defendant's punishment.  See United States v. Johnson, 378 F.3d 230, 245 (2d Cir.

2004).  The MVRA requires a sentencing court to impose restitution in "the full amount of each

victim's losses as determined by the court and without consideration of the economic

circumstances of the defendant."  United States v. Pescatore, 637 F.3d 128, 138 (2d Cir. 2011)

(citing 18 U.S.C. § 3664(f)(1) (A)).

For purposes of restitution, "the term 'victim' means a person directly and proximately

harmed as a result of the commission of an offense for which restitution may be ordered

including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C.§ 3663(a)(1)(2). "The requirement that the victim be 'directly and proximately harmed' encompasses the traditional 'but for' and proximate cause analyses," In re Rendón Galvis, 564 F.3d 170, 175 (2d Cir. 2009), while the "conspiracy" portion of this provision, according to the Second Circuit, "provide[s] for restitution payable by all convicted co-conspirators in respect of damage suffered by all victims of a conspiracy, regardless of the facts underlying counts of conviction in individual prosecutions." United States v. Boyd, 222 F.3d 47, 50 (2d Cir. 2000).

The term "loss" is defined by the restitution statute as "the amount of the loss sustained by each victim as a result of the offense." 18 U.S.C. § 3663(a)(i)(B)(i)(I). The statute provides that "[t]he defendant must 'pay an amount equal to . . . the greater of . . . the value of the property' on the date of the loss or on the date of sentencing, less 'the value (as of the date the property is returned) of any part of the property that is returned.'" Qurashi, 634 F.3d at 702 (quoting 18 U.S.C. § 3663A(b)(1)(B)).

The Second Circuit has written extensively on the term "value" as used in the statute. As the Court explained in Boccagna:

> [t]he MVRA employs the term 'value' in two separate, but interrelated, clauses necessary to the calculation of a restitution award. Title 18 U.S.C. § 3663A(b)(1)(B)(i) references 'the value of the [victim's] property' that was damaged, lost or destroyed as a result of the crime of conviction . . . [and] Subsection (ii) references "the value . . . of any part of the property that is returned,' in other words, the offset value.'

Id., 450 F.3d at 114 (citing 18 U.S.C. § 3663A(b)(1)(B)(i) and (ii)).

The Court further observed that the statute "unambiguously tells a court . . . *when* to value" the property—specifically, "in the case of loss value, property is evaluated 'on the date of damage, loss, or destruction' or 'on the date of sentencing' whichever is greater." Id. (citing 18 U.S.C. § 3663A(b)(1)(B)(I) and (II)).

But the Court also noted that "[t]he statute is silent . . . on the question of *how* the referenced property is to be valued" and that "nowhere does the statute reference 'fair market value' as the only measure to be used in making the restitution calculations contemplated by §3663A(b)(1)(B)." Id. "Rather," the Court was of the view that "the law appears to contemplate the exercise of discretion by sentencing courts in determining the measure of value appropriate to restitution in a given case." Id. The Court thus "construe[s] 'value' as used in the MVRA to be a flexible concept to be calculated by a district court by the measure that best serves Congress's statutory purposes." Id. at 115.

Reaffirming these principles this year in Qurashi, the Court affirmed a restitution award that sought "to restore a [fraud] victim, to the extent money can do so, to the position he occupied before sustaining injury" by including pre-judgment interest. Qurashi, 634 F.3d at 703 (internal quotation and citation omitted). The Circuit reasoned that because "sentencing courts are required to compensate victims for 'the full amount of each victim's losses,' there is no reason to exclude *losses that result from the deprivation of the victim's ability to put its money to productive use*." Id. (quoting section 3664(f)(1)(A) (emphasis added). Indeed, in holding that "the MVRA allows a sentencing court to award prejudgment interest in a criminal restitution order to ensure compensation 'in the full amount of each victim's losses,'" the Circuit expressly refused to place on the victims "the burden of showing how they would have used the lost funds." Id. at 703, 704.

In restitution proceedings, the government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence, and "[a]ny dispute as to the proper amount or type of restitution shall be resolved by the court by a preponderance of the evidence" 18 U.S.C. § 3664 (e). See generally United States v. Gjidija, 369 Fed. Appx. 282, 285 (2d Cir. Mar. 15, 2010) (quoting Section 3664(e)'s preponderance language); United States v. Donaghy, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008) (Amon, J.) (same).

The final restitution figure must correspond to all actually ascertainable losses, but where it is "impossible to determine the precise amount," a "reasonable estimate" will suffice. Catoggio, 326 F.3d at 329 (internal citation omitted); United States v. Agate, 613 F. Supp. 2d 315, 323 (08-CR-76) (JBW) (E.D.N.Y. 2009) ("[f]indings of the amount of loss may be based upon reasonable estimates") (citing United States v. Uddin, 551 F.3d 176, 180 (2d Cir. 2009)). See also United States v. Germosen, 139 F.3d 120, 129, 130 (2d Cir. 1998) ("quantity and quality of evidence the district court may rely upon to determine the amount of loss is the same" in restitution and sentencing guideline contexts; "the loss need not be determined with precision and [ ] the court need only make a reasonable estimate of the loss, given the available information"), cert. denied, 525 U.S. 1083 (1999).

## B.    General Findings

The government has presented me with a 1,718-page report (the "Restitution Report") prepared by the Criminal Prosecution Assistance Group of the National Association of Securities Dealers ("CPAG") that identifies more than 9,000 victims by name and reports a total loss of $190,339,436.65.[5]  According to the government, the CPAG, in preparing the report, relied on

---

[5] The government's initial report stated a total loss of $192,119,571.65, but the government then acknowledged that due to an oversight it had mistakenly included $1,780,135 that reflected a loss in Ageloff's own account.

the clearing firm's electronic blue sheet data, which reflect the actual purchase and sale by the victims of the fraud of the various brokerage firms' house stocks.[6] The government acknowledged that the restitution data was "incomplete" in that (1) it does not include every relevant stock, warrant and unit, (2) it does not include data from every clearing company, and (3) the reporting periods may be under inclusive. For these reasons, the government estimates that millions of dollars of losses were not captured in the report. Further, the report includes only customers who, based on the available records, suffered a net loss; i.e., it does not include customers who suffered fraud losses with respect to one or more house stocks but earned greater offsetting gains in other house stocks.

In the course of several rounds of submissions, including a series of principal filings shortly after the filing of the Restitution Report in 2002 and another series of filings in 2010 and 2011, Ageloff has raised and reasserted various arguments that, by my calculation, amount to a total of ten distinct objections to the government's proposed list of victims and losses. After careful examination of the parties' materials, I find—subject to the few conditions and exceptions noted below—that the government has sustained its burden of identifying actual victims of the fraudulent scheme spearheaded by Ageloff, and of establishing, under the applicable reasonable-estimate standards, the actual losses suffered by each of these individuals.

---

[6] "Blue sheets," so named because of the color on which they were once printed, are questionnaire forms on which clearing firms supply to the Securities and Exchange Commission certain information relating to trading activity, including the name of a security, the date traded, the price, the size of the transaction and the parties involved. Today, the universal electronic format, known as the "electronic blue sheet" or "EBS" system, has supplanted the former manual submission of the sheets. The SEC relies on the transaction information in the EBS system for various purposes and considers it an "effective[ ] enforcement tool." SEC Release 34-44494. See generally 17 CFR §240.17a-25(b).

Therefore—again, subject to few conditions and exceptions noted below—I adopt and make part of this restitution order the list of victims and losses compiled in that report.[7]

In so doing, I also find, by a preponderance of the evidence, that the bulk of Ageloff's objections to the Restitution Report are, like most of his attacks on the restitution order advanced before he was initially sentenced and again in the Circuit, "at best a disingenuous effort to avoid a consequence of his criminal behavior." Catoggio, 326 F.3d at 328. Indeed, as already noted, Ageloff is well aware that the MVRA, by its terms, "does not apply when the number of identifiable victims makes restitution impracticable or when determining complex issues of fact relating to restitution would complicate or prolong sentencing to an intolerable degree," Catoggio, 326 F.3d at 326, and is already on record as having argued on his appeal that in this case, "determining victims' losses [is] so complex that the need for restitution was outweighed by the burden on the sentencing process." Id. at 327. I read most of Ageloff's objections to the Restitution Report as an effort to refuel that position by manufacturing complexity in the hope that I might, at this late date, wave the white flag and decide that the matter of restitution is too complex or too much of a burden on the system after all. It is neither. Indeed, it would be an unconscionable injustice to grant such a windfall to the architect, engineer and enforcer of a massive fraud that injured so many thousands of investors and netted him many millions of dollars, and who has already resorted to additional criminal conduct (the Florida conviction) to avoid the financial consequences of his crime.

---

[7] The government made clear that it stood ready, had it been necessary to address the matter at an evidentiary hearing, to call NASD employee Peter Melley to testify briefly as to how the investor names and loss figures were gathered from the electronic blue sheets. But an evidentiary hearing was not necessary. Ageloff was furnished with both the report and the blue sheet data upon which it was based and those materials proved sufficient for him to identify and brief his objections, and the parties' copious submissions, in turn, furnish an adequate basis for me to rule upon those objections and fashion a restitution order appropriately responsive to the Circuit's mandate.

A degree of *tedium* inheres in the process, to be sure, but not *complexity,* and most of the work has been done.  The defect in my original ruling was that I put the cart before the horse, ordering restitution before the actual victims were identified by name and before the actual loss amounts were determined to a reasonable estimate.  That defect has now been remedied, as the thousands of victims and their specific losses have now been identified.  As explained more fully in my discussion of Ageloff's objections, I find that the Restitution Report adequately discharges the government's burden under the restitution statute, that the loss amounts it contains are "reasonable estimate[s]," Catoggio, 369 F.3d at 329, and that the losses it reports were valued by "the measure that best serves Congress's statutory purpose."  Qurashi, 634 F.3d at 703 (internal quotation and citation omitted).

C.      **Ageloff's Objections**

Ageloff's principal objection challenges the manner by which the government values loss for the investors who purchased Hanover Sterling's house stocks.  When Hanover closed, of course, certain of these shares remained unsold in the accounts of certain victims; for restitution purposes, the government takes the position that these unsold stocks were essentially worthless, assigns them a value of zero, and adopts as the measure of each victim's loss the price paid for the shares in question, without offset.  Ageloff, however, insists that for a variety of reasons these unsold shares still, for a brief period of time, had some value, and that the restitution order should account for this residual value as an offset to the government's loss total.  According to Ageloff, "[a]s a practice, after brokerage firms cease operations, stocks do not immediately go to zero or for that matter ever go to zero."  Instead,  he contends, "[a]lthough the loss of a major market maker will have a negative impact on the price of the stock, other factors such as 'short

covering,' other market makers' interest, company sponsored interest, and normal trading patterns give liquidity and value to the securities long after the demise of the brokerage firm."

I reject Ageloff's objection and find that zero is a reasonable estimate of the value of the unsold house stocks at the time that Hanover was closed down. This conclusion comports with observations and findings I have already made at prior proceedings in this case, including the sentencing proceedings of Ageloff and certain of his co-defendants,[8] and with my duty under the controlling MVRA standards to order restitution in the "full amount" of each victim's loss.

Consistent with my remarks at prior proceedings in this case and based upon the evidence adduced at the trial of Ageloff co-defendants Nazareno and Plamenco, I find that the house stocks in question were essentially worthless because the companies themselves were worthless, and that the appropriate measure of loss to each victim who was induced to make a sham investment is the amount invested (i.e., the purchase price of the house shares). See also Catoggio, 326 F.3d at 325 (noting that, according to the Presentence Report, "many of the [house stock] companies did little or no business"). Whether certain of these shares may have some theoretical residual paper value for a short period of time, and whatever that short-lived value may have been, are not material concerns for restitution purposes. Any possible de minimis residual value the stocks may briefly have had as a byproduct of continuing trading activity during the market's digestion of Hanover's collapse is not evidence of actual value or measurable offset.

---

[8] In Ageloff's case, see Status Conference, July 31, 2001, Tr. at 7-8; Sentencing, August 15, 2001, Tr. at 63. In the Plamenco and Nazareno cases, see Sentencing, January 24, 2002, Tr. at 13-14 (in response to a similar argument, I explained: "It sounds to me like you are challenging the evidence at trial. In the face of some of the evidence at trial . . . I really think the number in this case is zero. Not the measure of loss. The number in this case is zero. This was a house of cards. This was fraud throughout. Unusual fact pattern, my foot. This was a classic boiler room. Who are we kidding here? I do believe that in many ways the government's calculation, as they approached the calculation, is far more generous than it need be.")

In making such findings, I reiterate, as the reviewed authorities make clear, that I am to "exercise [my] discretion" in "determining the measure of value appropriate to restitution" in the particular case, and to adopt "the measure that best serves Congress's statutory purposes," Boccagna, 450 F.3d at 115, and those purposes of course are "to restore a victim, to the extent money can do so, to the position he occupied before sustaining injury." Qurashi, 634 F.3d at 703. Certainly the victims are entitled to the return of the money they were fraudulently induced to hand over to Ageloff. Id. (appropriate for restitution order to compensate for the "losses that result from the deprivation of the victim's ability to put its money to productive use") (internal citation omitted).

I also refer to a distinction drawn by the Fifth Circuit in United States v. Olis, 429 F.3d 540, 546 (5th Cir. 2005) and cited approvingly by the Second Circuit in United States v. Rutkoske, 506 F.3d 170, 180 n. 4 (2d Cir. 2007) between securities fraud conspiracies "where defendants promote[] worthless stock in worthless companies" and frauds that involve "'cook[ing] the books' and prop[ping] up a company's stock but do not . . . render the company worthless." Olis, 429 F.3d at 546. In the "worthless stock/worthless company" situation, "measuring the loss as the entire amount raised by the schemes is neither surprising nor complex, and is fully consistent with civil loss causation." Id. See also Rutkoske, 506 F.3d at 179, 180 n. 4 (principles governing recovery of damages in civil securities fraud cases should guide a sentencing court's determination of the amount of loss caused by a criminal stock fraud, citing Olis approvingly).

In advancing a different theory of valuation, Ageloff is essentially re-asserting positions he advanced at the time of sentencing,[9] which I have already rejected with the Circuit's approval,

_____

[9] See, e.g., *Defendant Ageloff's Sentencing Memorandum as to Restitution and Loss Calculation*, filed in May 2001, and *Defendant Ageloff's Motion for Downward Departure Based*

and nothing in the <u>Catoggio</u> decision authorizes Ageloff to reopen the question here. Assuming *arguendo* that the government's filing of the full Restitution Report somehow permits Ageloff to revisit the matter, I would reject his objection on the merits. Ageloff appears to urge me to rely upon the analysis of Bankruptcy Judge James L. Garrity, Jr. in the liquidation proceedings of Hanover Sterling's clearing firm Adler Coleman. <u>See</u> <u>In re Adler Coleman Clearing Corp.</u>, 247 B.R. 51, 113 (Bankr. S.D.N.Y. 1999).[10] Ageloff points specifically to the fact that, for purposes of the Bankruptcy Trustee's efforts under section 548(a)(1)(B) of the Bankruptcy Code, 11 U.S.C. § 548(a)(1)(B), to void certain transactions effected during the final days of Hanover Sterling's operation, Judge Garrity found that Hanover's house stocks had a discernible non-zero value on February 27, 1995 (the first trading day after Hanover ceased operations). <u>Adler Coleman</u>, 247 B.R. at 110.[11] Ageloff insists that I should treat the house stock shares still held by customers at the time Hanover ceased operations as having value, that I should specifically

---

*Upon the Estimated Loss Calculation Overstating the Consequences of the Specific Offense Conduct and Incorporated Memorandum of Law*, filed in July 2001. The 2001 filings included a report prepared on Ageloff's behalf by David I. Tabak, an economist with National Economic Research Associates, Inc, an expert witness consulting firm, that critiques the government's figures and offers competing assumptions as the bases for a different loss figure.

[10] On appeal to the United States District Court, Bankruptcy Judge Garrity's factual findings were largely adopted by District Judge Victor Marrero. <u>Jackson v. Mishkin</u>, 263 B.R. 406, 417 n. 1 (S.D.N.Y. 2001).

[11] Even more specifically, Judge Garrity concluded that, for purposes of determining "reasonably equivalent value" under section 548(a)(1)(B), the "posted prices" of the Hanover Sterling house stocks on February 27, 1995 (the first trading day after the NASD closed Hanover down) were "a more accurate reflection of th[e] value" of the house stocks than the "posted prices" during the final week of trading because the former better indicated the stocks' value in a Hanover-less market. <u>Id.</u> <u>See also</u> <u>Jackson</u>, 263 B.R. at 465 (Judge Marrero finds that Judge Garrity correctly "adopted House Stock prices recorded on February 27, 1995 as the most accurate reflection of the House Stocks' fair market worth as of February 16").

assign to them the same value Judge Garrity assigned them in the bankruptcy proceedings, and that I reduce the government's loss calculation by that amount. [12]

The flaw in Ageloff's assertions is that they entirely ignore the difference in context and valuation purposes. The non-zero paper value that Judge Garrity assigned the unsold house shares was *not* a "fair market value" or a "going concern value" but rather "what could be obtained at a liquidation sale" because, as Judge Garrity recognized, Adler and Hanover were "on [their] deathbed[s]." Adler Coleman at 111. Further, Judge Garrity appreciated that in the realities of the market the stocks were essentially worthless because "there was little or no substance to the companies involved" and because "no one would have bought the stocks had they known about the fraud." Id. at 112. I would add: had all the victims acquired contemporaneous knowledge of the fraud and sought to offset their losses by rushing to unload the shares left in their accounts, the actual posted price would have plummeted to zero or near-zero levels.[13]

In sum, mindful of my obligation to fashion a restitution order that attempts to "restore these victims to their original state of well-being," Boccagna, 450 F.3d at 115, and, in doing so, to "exercise [my] discretion" to construe the "flexible concept" of value "by the measure that

---

[12] The opinion of Ageloff's witness David I. Tabak advances the same valuation position although using slightly different numbers than those used by Judge Garrity.

[13] As it is, Judge Garrity's analysis documents the precipitous declines in value that the stock actually experienced in the post-Hanover market. Take, for example, the house stock Eagle Vision, Inc. On January 19, 1995, the day before the short sellers began to depress the price of the stock, Eagle Vision closed at $4.00. On February 24, 1995, the closing price was $1.13. On February 27, 1995, the first trading day after Hanover Sterling closed and was no longer able to prop up the stock price, Eagle Vision's stock price dropped another 75%. The drop would have been even greater had Hanover Sterling customers been able to trade in their accounts that day (which of course they could not, because Hanover Sterling had ceased operations). Indeed, one and a half years after Ageloff and his co-defendants stopped manipulating the market, the prices of the house stocks that Hanover Sterling sold were less than 25% of their value on February 27, 1995. See Adler Coleman, 247 B.R. at 110.

best serves Congress's statutory purposes," id. at 114, 115, I conclude, by a preponderance of the evidence and for the purpose of reasonably estimating actual losses, that the value of unsold house stocks was zero.

The second of Ageloff's objections warranting attention is his "Objection Number 2," in which he asserts that the government's report overstates total loss because, according to him, it contains fictitious trades and accounts. Ageloff states specifically that "[d]uring the last weeks of Hanover Sterling, the Brokers of the firm made trades in 'dummy' accounts" and that the purpose of these trades "was to paint a false picture of activities in a particular stock." Ageloff identifies twenty specific trades occurring during February of 1995 as fictitious transactions, but asserts that they form "just a cursory list" and, curiously, that they represent "only 10%" of the total fictitious losses. Indeed, Ageloff asserts, presumably with a straight face, that the total of such allegedly fictitious losses exceed $80 million—i.e., that more than 40% of the losses in the government's report are fake. This fantastical assertion, like the proverbial thirteenth chime on the clock, seriously undermines all that preceded it, and alone is a basis for me to reject his "fictional loss" assertion out of hand as yet another of his tactical, disingenuous efforts to force me to conclude that the restitution proceedings have become impossibly complex or burdensome within the meaning of section 3663A(c)(3)(B)—and, indeed, to deeply regret my finding at the time of sentence that Ageloff accepted responsibility for his massive fraud.

But I have an ample record basis for rejecting this objection as well. Ageloff is careful in defining what he calls fictional trades as transactions where "no money changed hands," but the purchases listed in the government's report (based on the actual blue sheet data of the clearing firm) are "settled" trades, i.e., transactions for which money was exchanged between the buyer and seller. By a preponderance of the available evidence I therefore reject Ageloff's bare, self-

serving, and facially incredible assertion that $80 million of the $190 million in losses reported are fictitious.

The government, of course, has no desire to obtain restitution for fictional accounts, and I of course have no authority to order it. I am also aware that Judge Garrity's analysis does suggest that Ageloff and his brokers made a substantial number of fake buys during a four-day period in the last days of Hanover's operations.[14] Nevertheless, what Judge Garrity describes as fake buys are those that no one paid for, whereas, as noted, those in the government's report are, according to the government's representation and the underlying blue sheet data, settled transactions in which money actually changed hands. Nevertheless, exercising my statutory discretion to fashion an appropriate restitution order, in an abundance of caution I adopt a proposal made by the government and order that, as a condition to receiving his or her restitution payment, each victim certify under penalty of perjury not only that he or she is the person identified in the report but also that he or she has sustained the losses set forth in the report. Additionally, if the victim's loss has been offset by recovery from another source, such as arbitration, civil action, or a sale, the victim shall be required to furnish the details of that offset and the amount payable would then be reduced accordingly. See generally, 18 U.S.C. §3664(j).[15]

---

[14] See Adler Coleman at 69. Judge Garrity found that "[b]etween February 13 and 16, while it was acquiring House Stocks in its proprietary accounts, Hanover booked $3.3 million in fake House Stock buys in the accounts of 31 customers (the 'Pre–Final Week Fake Buys')." Id. Judge Garrity "conclude[d] that those 'buys' were fake because," *inter alia,* (i) no one ever paid for them," and "customers representing 75% of the 'buys' by dollar value denied that they ordered them and no customers acknowledged ordering them." Id.

[15] Subsection 1 of section 3664(j) provides:

> If a victim has received compensation from insurance or any other
> source with respect to a loss, the court shall order that restitution
> be paid to the person who provided or is obligated to provide the

I am confident that this is the appropriate resolution of the restitution question before me and that, merely because it contemplates some "process" at the point of actual payout to victim, this solution does not run afoul of the <u>Catoggio</u> mandate.  The principal <u>Catoggio</u> error has been remedied inasmuch as the substantial corpus of victims has been identified and reasonable estimates of their losses compiled, but I do not read <u>Catoggio</u> as prohibiting any cross-checking at the point of payout.  Indeed, the reasonable estimate and preponderance of the evidence standards necessarily contemplate that certain data, including such basic information as the addresses of the victims, will necessarily be subject to verification or minor adjustment even after the restitution order issues.  Certainly the standards do not prohibit a cross-check at the point of payout.  (For example, as already noted, the restitution statute itself requires that any amount actually "paid" to a victim be reduced by any amount "later recovered" as compensation, 18 U.S.C. § 3664(j)(2), and likewise authorizes a victim who "subsequently discovers further losses" to petition the court for an amended restitution order.  18 U.S.C. §3664(d)(5)).

Can I say that the government has proven, beyond a reasonable doubt, that its Restitution Report is without blemish?  Of course not.  Even the government makes no such representation.  <u>See</u> Gov. Letters of June 3, 2002 and July 11, 2003.  But the MVRA does not hold the

---

compensation, but the restitution order shall provide that all restitution of victims required by the order be paid to the victims before any restitution is paid to such a provider of compensation.

Subsection (2) provides:

Any amount paid to a victim under an order of restitution shall be reduced by any amount later recovered as compensatory damages for the same loss by the victim in—

(A) any Federal civil proceeding; and

(B) any State civil proceeding, to the extent provided by the law of the State.

government or district courts to such an impossible standard; if it did, the capacity of a defendant with Ageloff's resolve to avoid restitution would hold a restitution order hostage, in perpetuity, to alarmist attacks that the defendant himself is in the best position to disprove, and eventually to the pettiest of objections, perhaps on the scale of nickel-and-dime quarrels about amounts and specious challenges to a surname here or an address there. The standards, consistent with the purposes of the MVRA, require only reasonable estimates arrived at by a preponderance of the evidence. A fortiori, absolute precision is not required.

Indeed, for all these reasons, I also accept and incorporate as part of this order the government's representation that it shall hold the collected restitution funds in trust, to exist for no longer than twenty years, at which time the restitution judgment will expire by operation of New York law and any undistributed funds shall be returned to Ageloff. See United States v. Berardini, 112 F.3d 606, 610, 611 (2d Cir. 1997) (affirming district court's decision to order defendant to make restitution payment to government as trustee for the identified but not yet located victims). As I have explained, based on the materials furnished by the government and Ageloff, I am satisfied that, more likely than not, the government's report presents a reasonable if under-inclusive estimate of the victims and their losses. I am likewise satisfied that the vehicle of the trust combined with victim certifications upon payout are an adequate check against the unlikely possibility that any of the contingencies suggested by Ageloff's objections should materialize.

In resolving the matter in this fashion I must also make clear that I am not uninfluenced by the fact that Ageloff has, for the express purpose of avoiding his restitution obligation, successfully squirreled away the assets that might have been the source of restitution, and so there is a very real possibility that not one of the thousands of victims identified in the

government's report will recover a dollar from this man. Of course, as the Circuit noted in

Catoggio, the restitution order must issue without regard for the defendant's ability, or

willingness, to pay because Congress wished "to ensure that victims be fully compensated for a

defendant's past crimes if that defendant 'unexpectedly inherit[s] money, win[s] the lottery, or

otherwise strike[s] it rich.'" 326 F.3d at 329 (internal citation omitted). But I do not believe the

order should be held hostage to a defendant's campaign to manufacture complexity. If anything

inheres in the preponderance of the evidence standard it is this: some degree of estimating must

outweigh the certainty of allowing a thief to walk away with his ill-gotten gains.

Ageloff's remaining objections require little or no discussion. They are either a

rehashing of arguments that I have previously found to be meritless and that are beyond the

scope of the limited mandate, or frivolous on their face. A representative example is Ageloff's

now familiar refrain that the restitution amount should be reduced to account for the role of the

short sellers. Ageloff first sought to shift the blame for his own criminal conduct onto the short

sellers in his very first sentencing submission, filed May 30, 2011, and I made an unequivocal

ruling rejecting that assertion at the time of sentencing, where I determined that the role of the

short sellers was not relevant to Ageloff's criminal culpability:

> The multiple causation, I have always had difficulties with it.
> With due respect to counsel, although . . . I understand the
> vill[ai]nous short-sellers played a role in bringing [Hanover] to its
> [knees] and ultimately Adler Coleman to its knees, these activities
> were after the fraud, certainly after the intended fraud. This was
> what brought this house of cards [down] – and indeed it was a
> house of cards, doomed inevitably to this state of collapse.
>
> I think we need to distinguish between the fraud and the attempt to
> [de]fraud and those events that followed: the short selling, the
> efforts by Mr. Ageloff and others to meet the sales, the efforts to
> induce the authorities to stop the trading. This is all damage
> control, it seems to me, and has virtually nothing to do with the
> loss.

The presence of the short sellers of course was entirely foreseeable, and under the MVRA, Ageloff, as the admitted architect and enforcer of the pump and dump scheme, is responsible for his victims' reasonably foreseeable losses. See Famiglietti v. United States, 2010 WL 996004, *2 (S.D.N.Y. Mar. 12, 2010) (citing United States v. Boyd, 222 F.3d 47, 50-51 (2d Cir. 2000). Indeed, it is likely that the short sellers were the first to spot the fraud but they were not part of the scheme. As the government explained in its initial response to Ageloff's effort to shift blame to the short sellers, Ageloff's version of events "is myopic because Ageloff engaged in fraud long before the short selling at Hanover Sterling in late 1994, and engaged in fraud long after Hanover Sterling went under in February 1995." Ageloff's position "is also myopic because it ignores the illegal actions taken by Ageloff and others in response to the short selling."

Beyond this, nothing in the Catoggio decision authorizes Ageloff to re-open the question. Assuming without deciding, however, that the re-opening of the restitution proceedings permits Ageloff to reopen the question of the role of the short sellers, I would again reject his contentions for the reasons already stated. I agree now, as I did in 2001, with the government's assessment, as set forth in its 2001 sentencing submission. As the government understood, Ageloff was

> still focusing on his anger at being attacked by the short sellers, which helped cause the demise of Hanover Sterling. That the con man was himself outmaneuvered by others does not diminish his own criminal conduct. Moreover, it is simply untrue that the short sellers caused the vast majority of loss or indeed any loss for the purposes of Ageloff's sentencing. As explained by Phil Gurian and other cooperating witnesses (as well as by Catoggio on tape to an undercover FBI agent), the Hanover Sterling house stock was artificially inflated and was going to fall eventually. The short sellers just led to it happening sooner rather than later. But the farud by the Hanover Sterling brokers was already complete—the house stock had been artificially inflated and sold. The only

> question was when the price was going to collapse.  In some cases
> the triggering event was the advent of short selling; in others,
> search warrants and indictments.

In sum, revealing the true tenor of this and all of Ageloff's objections is the principal one to which they are all bootstrapped, and which is the most preposterous of all:  even in the face of his plea allocution, Ageloff objects to the Restitution Report on the ground that the government has not in fact proven that "even one investor suffered any loss as a result of [his] conduct or misconduct."

My one clear sentencing error, and deep regret, is that I allowed Ageloff a three-level adjustment for acceptance of responsibility.

## D.     Continued CJA Funding

As I have already expressed both in open court, see, e.g., Hearing Tr. May 11, 2010, and by order, see Order dated May 17, 2010, given the nature of the fraud committed here, the extent of the losses, Ageloff's role as leader and enforcer, and the particularly disturbing revelation that he resorted, post-conviction, to additional criminal activity in order to hide the proceeds of his crime, I was constrained as trustee of the public fisc to question Ageloff's claim that he is without financial ability to afford counsel.  I continue to harbor serious misgivings about the public financing of Ageloff's defense.  Nevertheless, despite serious reservations but conscious of the practicalities in play, I conclude that current counsel will receive reasonable CJA compensation for appropriate services performed to date.  Any attorney efforts beyond the confines of this Court will require appointment and authorization from the Circuit Court.

My issuance of restitution findings in this Memorandum has rendered moot Ageloff's request for *additional* CJA funding to prepare for an evidentiary hearing on the question of

restitution.[16]  Accordingly, I deny that request without reaching the question of Ageloff's financial eligibility, which was the subject of an evidentiary hearing on June 1, 2010.

## E.  Release of Funds

As required, Ageloff made deposits with the Clerk of the Court totaling approximately $536,000.  He claims that under <u>Catoggio</u> he owes no restitution and is entitled to a return of those funds, and so has moved for reconsideration of my May 19, 2010 order denying the funds' release.  <u>Catoggio</u>, of course, did not absolve Ageloff of his restitution obligation.  The motion for release of funds is again denied.

## III.  The Passage of Time and Ageloff's Efforts to Exploit It

The docket sheet in this case speaks for itself: the passage of time since the <u>Catoggio</u> mandate is a matter of record and most regrettable, but Ageloff has seized on it opportunistically. He argues that the passage of time somehow entitles him to complete absolution from his restitution obligations and has formally moved to dismiss these proceedings or for an order imposing no restitution.  Ageloff's position is indeed an extravagant one:  despite the Circuit's affirmance that MVRA restitution is mandatory in this case, <u>Catoggio</u>, 326 F.3d at 326, Ageloff argues that the remedy for the already unfortunate delay in providing restitution to those harmed by his crimes is to *never* make the overdue amends.  He has fastened his request for a windfall restitution reprieve to an assortment of legal doctrines that deal with sentencing delays and claims relating to those delays, but none of the doctrines he invokes is applicable to the unique event that has been delay's casualty in this case, namely, the re-imposition of *only* the restitution portion of a sentence upon a defendant who, for the entirety of the claimed period of delay, has been incarcerated under the timely imposed custodial portion of the sentence and who, while

---

[16] Ageloff seeks public funds to enable Mr. Fenstermaker to retain additional counsel, an expert witness, and a private investigator to prepare for an evidentiary hearing on restitution that, by counsel's estimate, would "last, at a minimum, three months, if we work five days a week."

incarcerated, has engaged in further criminal activity for the purpose of avoiding his restitution obligation.

When a litigant, particularly a criminal defendant, invokes "delay," briefing inevitably turns to discussion of the causes of that delay and the apportionment of blame, but those matters are essentially immaterial at this juncture. Without question, this matter has not proceeded expeditiously. Ageloff's distant incarceration and eventual prosecution in Florida for secreting funds away from the victims of his fraud, the several changes in attorneys on both sides of the case, lengthy adjournments in anticipation of agreement between the parties, and this Court's regrettable failure to press for closure, have dragged the proceedings.[17] And, to be sure, there is an abiding sense that Ageloff's ill-gotten gains are, and will remain, far beyond the reach of his many victims. It is also quite clear, given Ageloff's proclivities, that he will go to great extremes to deprive his victims of any recompense should any public windfall come his way.

_____

[17] Responsibility is readily divisible but of course ultimately lies, as it must, with the Court, as I have already acknowledged to the parties. See Hearing Tr., September 7, 2007 at 2, 3 ("I and a few others dropped the ball on this remand but the primary responsibility I accept is mine in the Ageloff case . . ."). But as the record also reflects: (i) Ageloff initially requested a stay of the remanded restitution proceedings until the United States Supreme Court ruled upon his petition for a writ of certiorari; (ii) the government probably should have been more responsive to the efforts of Ageloff's prior counsel, Brian Bieber, to address the restitution question during 2004, see Declaration of Brian H. Bieber, Esq., dated March 23, 2010; (iii) in September 2007 the parties reported to me that they were engaged in conversations directed toward a possible resolution of the restitution issue; and (iv) delay of these proceedings was an unavoidable consequence of Ageloff's incarceration in Florida and of his resumption, while there, of his criminal ways. See Gov. Ltr. dated July 11, 2003 ("The government had hoped to narrow the outstanding issues before presenting them to the Court [but] has been hampered by the fact that Ageloff is pro se and is incarcerated in Florida. The government has spoken several times with an attorney who currently represents Ageloff in civil matters and with his former appellate counsel. Both of these attorneys have indicated that they are not authorized to represent Ageloff with respect to restitution"); Gov. Ltr. dated May 6, 2010 at 3-4 ("for nearly all of the years 2008 and 2009, [Ageloff] was in custody in the Middle District of Florida in connection with the Florida conviction, a matter which required resolution before the instant matter could resume"); see also Fla. Plea Hearing Tr. at 21 (Ageloff's counsel explains to court that the restitution judgment was vacated but "still on [the] docket" and that "[t]he only reason they haven't addressed the issue is that Mr. Ageloff is here in our district dealing with this criminal issue").

But the dispositive inquiry under the various doctrines Ageloff invokes is whether Ageloff was prejudiced by the delay of which he complains. The answer, on the record in this case, is an unequivocal no, and the motion to dismiss the proceedings or in the alternative to impose zero restitution is therefore denied.

Representative of the meritlessness of Ageloff's position is his reliance, as a basis for dismissal of these proceedings, on the MVRA's requirement that victim losses be identified, and a final restitution order issue, within ninety days of sentencing. See 18 U.S.C. § 3664(d)(5); United States v. Stevens, 211 F.3d 1, 4 (2d Cir. 2000), cert. denied, 531 U.S. 1101 (2001). As the Circuit already explained to Ageloff in Catoggio, however, a district court's failure to order restitution within the 90 days required by the statute "can be considered harmless error and a defendant is not entitled to enforce that 90-day limit without showing 'that the delay caused prejudice to his or her defense.'" 326 F.3d at 329-330 (quoting Stevens, 211 F.3d at 5). The Circuit has reaffirmed this principle in later decisions. See, e.g., United States v. Zakhary, 357 F.3d 186, 188 (2d Cir. 2004) ("a presumption of harmlessness applies to any error in the timely identification of victims' losses"). See generally Dolan v. United States, __ U.S. __, 130 S. Ct. 2533, 2539 (2010) ("The fact that a sentencing court misses the statute's 90-day deadline, even through its own fault or that of the Government, does not deprive the court of the power to order restitution").

In claiming that the post-mandate delay violates the MVRA's ninety-day rule, Ageloff fares no better than when he invoked the rule on his appeal. To be sure, the quantum of time involved is greater at this juncture than at the time of his appeal, but legally, Ageloff stands in essentially the same position because he again cannot show "that the delay caused [him]

prejudice." <u>Stevens</u>, 211 F.3d at 5.  On the dispositive prejudice inquiry, the Circuit in <u>Catoggio</u> explained:

> the only prejudice Ageloff argues before this court is that the government's inability to prove the identities of the victims and their losses within the 90-day period evidences the government's inability ever to provide such proof.  Ageloff argues that 'the 90-day window is mandatory, in part, because it forms a benchmark separating the identified and identifiable victims with discrete and provable losses from those who cannot be identified and whose supposed losses are incapable of proof.'  We have already rejected Ageloff's contention that the victims and their losses in this case are all unidentifiable.  *We also note that the intent behind the 90-day period was not to protect defendants, but rather to protect victims from the willful dissipation of a defendant's assets.*

<u>Id.</u> at 330 (emphasis added).

Ageloff's assertion of prejudice is no greater now than at the time of his appeal.  Indeed it is frivolous.  The chronology of critical dates elucidates the point.  In *June 2002*, the government submitted its Restitution Report; by *October of 2002*, Ageloff had submitted no fewer than four pro se submissions addressed to the report, including his expansive set of objections, a motion to strike the report, and a request for voluminous additional discovery relating to the bases for the report's loss figures; and in *July 2003*, the government filed its written response to Ageloff's 2002 submissions.  Ageloff's claim of prejudice is that, it was not until March 2010—in response to the second round of submissions he filed through counsel, reasserting his 2002 objections and discovery request—that the government "finally acknowledged that the only evidence it had to prove its restitution claims was contained in the Restitution Report and the underlying 'blue sheet data' and that it did not have the documentation [he] requested."  According to Ageloff, "[h]ad the government been forthright in 2002 and 2003 about its lack of meaningful loss data, [he] could have taken steps to secure the information necessary to disprove the government's restitution claims."

Ageloff is talking nonsense. The government's July 2003 submission was fully
responsive to Ageloff's discovery request. The letter explained to Ageloff that:

> [m]ost of the documents that the defendant seeks, if they exist at all, are not in the
> government's possession. The government has no hard copy account records for
> Hanover, which closed prior to the government's investigation. The government
> has certain paper records from the other firms [but] these records are not
> comprehensive.
>  . . .
>
> The Restitution Report is generated from data contained in a 25 megabyte
> electronic database compiled by the NASD's Criminal Prosecution Assistance
> Group from available electronic bluesheets.

The government furnished the electronic blue sheets and offered to furnish the database
on CD-ROM. More critically, based solely on the Restitution Report and underlying electronic
blue sheets, Ageloff was able to generate the comprehensive set of objections to the Restitution
Report that he filed in 2002. In short, the notion that the government left Ageloff unable to
proceed with analysis of the Restitution Report for seven years, or that the passage of time in any
way hampered Ageloff in analyzing the trading activity that was carried on at his bidding and
during his criminal watch, is absurd.[18]

_____

[18] For the same reasons, I also reject Ageloff's prejudice claim premised on the alleged
loss of an analysis of the Restitution Report that Ageloff claims he created. Ageloff asserts that,
while drafting the restitution objections that he filed in 2002, he also created an analysis of the
Restitution Report, saved that report on a computer floppy disk, stored that disk in a safe deposit
box in Florida, and left copies of the disk with his former attorneys Hirschhorn & Bieber, P.A.
and in a storage area of the correctional facility in Yazoo, Mississippi. He further asserts that,
when searching the Florida safety deposit box in connection with his Florida money laundering
crimes, federal agents from the Middle District of Florida seized the disk from that box and then
either lost or destroyed it, and that the other two copies of the report cannot be found.

Ageloff has furnished the Department of Justice's receipt for the items recovered during
the search, and the inventory does reference one floppy disk, but I am nevertheless not fully
persuaded that the "disk" in fact contains a detailed analysis of the Restitution Report—or, at the
very least, an analysis that has not already made its way into Ageloff's objections. It is Ageloff's
claim that he prepared this now permanently lost report at the same time he was drafting his
restitution objections; if so, then, why, for example, when Ageloff asserts that the report contains
fake trades, would he supply what he calls "just a cursory list" of the allegedly fake trades and

Indeed, Ageloff's attempt to fashion a prejudice argument under the MVRA's 90-day rule is yet another of his disingenuous ploys to avoid paying restitution and a misuse of the statute. Returning to the most critical words on the subject, as the Circuit noted, the purpose of the MVRA's 90-day rule is to protect the victims, not the defendant. The facts here are an unfortunate case in point: *it is the very delay that Ageloff now complains of that he took advantage of by doing just as the drafters of the 90-day provision feared, namely, by engaging in the willful dissipation of the assets that should have gone to the victims.*

Ageloff's remaining delay-based claims, under the Fifth Amendment's due process clause, the Sixth Amendment's speedy trial clause, and Federal Rule of Criminal Procedure 32(b)(1), require little discussion.

Ageloff's due process claim presents under a constitutional umbrella essentially the same assertions of prejudicial delay advanced under his MVRA claim, so for the reasons already discussed, I reject that claim. See generally United States v. Ray, 578 F.3d 184, 199 (2d Cir. 2009), cert. denied, __ U.S.__, 130 S. Ct. 2401 (2010); United States v. Paul, 634 F.3d 668, 675 (2d Cir. 2011). The prejudice required for a due process violation based on delay in sentencing must be "substantial and demonstrable," Ray, 578 F.3d at 200, and arises when, as in Ray, (i) the

---

not the entire list? It is all too easy for Ageloff to point (opportunistically) to a lost item and claim that it contains some sort of indispensable smoking gun analysis. But even if I fully credit Ageloff's assertion, and he did prepare such an analysis, I nevertheless fail to see how he has been prejudiced by its loss. If Ageloff was in fact preparing the analysis at the same time that he was drafting his objections, as he now asserts, then I have every reason to assume that the most material aspects of that analysis made their way into the objections that Ageloff filed; I have enough experience with Ageloff to know him not to be so foolish as to keep a smoking gun hidden.

Most critically, even if I indulge the unlikely assumption that the analysis exists and that it contains material information that Ageloff willfully withheld from the comprehensive restitution objections that he filed in 2002, Ageloff has failed to show how *the passage of time* is responsible for the seizure of the disk – that, he must know, is the result of his own continued criminal activity—or for any conceivable brand of prejudice he may have suffered.

delay is substantially longer than what is claimed here, (ii) the untimely imposed sentence is *custodial*; and (iii) the un-sentenced defendant has, in the interim, gone on to live "a law-abiding and productive life." Id. at 201.  Cf. Paul, 634 F.3d at 675 (four-year delay in sentencing did not prejudice defendant who remained in home detention pending sentencing; he "at no time [believed] that the matter was behind him, nor did he have the opportunity to fully reintegrate into society").  Ageloff has not shown how the delay in correcting only the restitution portion of his sentence could cause him prejudice on the scale of that found in Ray.  He has spent the past ten years in prison, has continued to engage in criminal conduct, and has, through both his secreting of restitution assets and his zealous litigation of restitution-related issues, demonstrated that he did not believe the restitution matter "was behind him."  Paul, 634 F.3d at 675.

Ageloff's Sixth Amendment claim, that the delay in restitution resentencing violates his right to a speedy trial, is foreclosed by the Circuit's holding in Ray, 578 F.3d at 198-99 ( "we hold that the Speedy Trial Clause of the Sixth Amendment, which governs the timing of trials, does not apply to sentencing proceedings").  Ageloff concedes the point but asserts the claim in order to preserve it.  See Defendant's Memorandum of Law in Support of Motion for Miscellaneous Relief at 13.

Finally, Ageloff argues that the delay in re-sentencing him on restitution violates the requirement of Federal Rule 32(b)(1) that the district court "impose sentence without unnecessary delay."  In order for a delay in sentencing to violate Rule 32(b)(1), Ageloff must demonstrate that the delay was "purposeful and oppressive, or even smack[s] of deliberate obstruction on the part of the Government, " United States v. Grabina, 309 F.2d 783, 786 (2d Cir. 1962), cert. denied, 374 U.S. 836 (1963), but the delay in this case cannot conceivably be so characterized.

**IV.     Remaining Applications**

Ageloff has further sought to exploit the limited <u>Catoggio</u> remand by moving to withdraw the plea of guilty that he entered more than ten years ago, to a single count of a 34-count superseding indictment.  He invokes both Rule 11 of the Federal Rules of Criminal Procedure and, in the alternative, the federal habeas statute, 28 U.S.C. § 2255, but appears to recognize that neither provision actually authorizes his application.

Rule 11(e), added in 2002 and based on a provision in the former Rule 32, provides that "[a]fter the court *imposes sentence*, the defendant may not withdraw a plea of guilty or nolo contendere, and the plea may be set aside only on direct appeal or collateral attack." Fed. R. Crim. P. 11(e) (emphasis added).

It is, of course, a matter of record that sentence has been "imposed," but Ageloff argues that because he has yet to be re-sentenced on restitution, his sentence has not been "imposed" within the meaning of Rule 11.  He believes he therefore falls within the letter of Rule 11(d)(2)(B), which provides that "a defendant may withdraw a plea of guilty . . . after the court accepts the plea, but before it imposes sentence if the defendant can show a fair and just reason for requesting the withdrawal."  Ageloff has offered me no authority to support his construction of Rule 11 and, given the dictates of the well-established mandate rule, I am not inclined to adopt it here.  <u>See</u> <u>United States v. Stanley</u>, 54 F.3d 103, 107 (2d Cir. 1995) ("Because [defendant] decided on his first appeal to forego any argument concerning the §2F1.1(b)(2) enhancement, the mandate rule prohibited the district court from reopening the issue, unless our initial opinion called for de novo resentencing").  <u>Burrell v. United States</u>, 467 F.3d 160, 165 (2d Cir. 2006) ("This rule that the district court's authority on remand is limited to those issues left open by the mandate is a firm one and rigidly binds the district court.") (citing <u>United States v. Quintieri</u>, 306 F.3d 1217, 1225 (2d Cir. 2002)).  On his direct appeal Ageloff did not challenge his plea or the

custodial portion of his sentence; the Second Circuit vacated only the restitution portion of his sentence; and the mandate confines these proceedings to correction of the restitution order only.

Ageloff appears to fare no better with his invocation of the federal habeas statute. Whereas the crucial time for Rule 11 purposes is when the court "imposes sentence," the critical event for purposes of an application for relief under 28 U.S.C. §2255 is "the date on which the judgment of conviction becomes final." 28 U.S.C. §2255 (f)(1). Although sentence was imposed for Rule 11 purposes back in 2001, Ageloff's judgment of conviction would not be final for Section 2255 purposes until the completion of these restitution proceedings, the resolution of any direct appeal he may thereafter take, and either the expiration of his time to seek Supreme Court review or the denial of any petition for such review. In short, there is simply no vehicle for an interlocutory collateral attack. Furthermore, a collateral attack on a conviction under section 2255 cannot properly be brought in the criminal proceeding it is collaterally attacking but instead must be filed in a separately commenced civil proceeding.

In any event, assuming either that Catoggio "un-imposed" Ageloff's sentence for Rule 11 purposes or that his conviction was final for 2255 purposes and that I could reach the merits of his request to withdraw his plea, I would reject it.[19]

Ageloff seeks to withdraw his plea on the grounds that the plea was obtained in violation of his Fifth Amendment right to due process of law pursuant to Brady v. Maryland, 373 U.S. 83 (1963), and his Sixth Amendment right to effective assistance counsel. See generally Strickland v. Washington, 466 U.S. 668, 688 (1984). These assertions are frivolous.

---

[19] To the extent a procedurally viable 2255 application were before me, I would summarily deny it without directing the government to respond because the "motion and the files and the records of the case conclusively show that [Ageloff] is entitled to no relief" within the meaning of 28 U.S.C. §2255 (b).

Ageloff represents that on or about May 3, 2010, he received by email transmission from associate general counsel of the Financial Industry Regulatory Authority ("FINRA," successor organization to the NASD) the inventory of the record on appeal in the matter of *NASD v. John Fiero*. Fiero, according to Ageloff, was one of the leading short-sellers trading in Hanover Sterling house stocks in the firm's final days. The record in the *Fiero* appeal apparently contains nearly 31,000 documents that, according to Ageloff, "constitute[ ] evidence of the short sellers' illegal conduct resulting in the downfall of both Hanover Sterling and [its clearing agent] Adler Coleman." Ageloff claims these FINRA documents are *Brady* materials. He asserts that they "were in the government's actual or constructive possession during the pendency of [his] matter" and that they are exculpatory in that "they both undercut the government's theory of [Ageloff's] criminal culpability and call into question whether the government overstated the loss calculation for sentencing purposes." Indeed, Ageloff now makes the following assertion:

> I am innocent of the charge to which I pled guilty in this matter. I pled guilty because my attorney advised me to do so because he was unaware of any legal defense to the charge to which I pled guilty. In addition, because of what my attorney felt were the potential sentencing implications of the limited information we had at the time of my guilty plea, I felt that I had no choice but to plead guilty. Had we known of the documents in FINRA's possession at the time of my guilty plea, I believe we would have had a defense to my criminal culpability . . .

(Ageloff Declaration, dated May 27, 2010 at ¶3.)

Once again, Ageloff is all rhetoric and obfuscation. First, the documents Ageloff describes are not *Brady* material because, as already discussed, the actions of the short sellers do not diminish Ageloff's culpability. Second, Ageloff's casting of the Fiero documents as some sort of recently discovered evidence on the activities of the short sellers is belied by the fact that, since his earliest substantive sentencing submission filed in 2001, Ageloff himself has been

showcasing the subject, and in so doing has represented himself as having a specialist's command of the subject. The specific claim that Ageloff advances for purposes of seeking to withdraw his plea—i.e., if he knew then what he knows now about the short sellers he would not have pled guilty—is frivolous in the face of his own persistence in seeking to shift blame to the short sellers. For the same reasons, I also reject as frivolous Ageloff's claim that that the attorneys who advised him to accept a plea to a single count of a 34-count indictment deprived him of his constitutional right to effective assistance of counsel. Ageloff would have to show that in so advising him, counsel's conduct "fell below an objective standard of reasonableness" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 694. In the context of a guilty plea, the prejudice prong of Strickland requires Ageloff to show, that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). Ageloff has not made this showing.

## CONCLUSION

For all of the foregoing reasons, (i) Ageloff's motion to dismiss the resentencing or, in the alternative, to resentence him without the payment of restitution is denied; (ii) Ageloff's motion to withdraw his guilty plea is denied; (iii) Ageloff's motion to strike the Restitution Report prepared by the government is denied; (iv) each of Ageloff's objections to the Restitution Report is rejected; (v) subject to the conditions described in this Memorandum, the government's Restitution Report is adopted and Ageloff is ordered to pay restitution in the amount of $190,339,436.65, payments to be made according to the schedule announced in my initial 2001

Restitution Order.  The financial reporting requirement and conditions of supervised release imposed at the time of sentencing also continue to be applicable.  The Clerk of the Court is directed to prepare and file an appropriately amended Judgment and Commitment.


SO ORDERED.

Dated: Brooklyn, New York
       August 19, 2011


                                        s/ Judge Raymond J. Dearie
                                        _____
                                        RAYMOND J. DEARIE
                                        United States District Judge