UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
UNITED STATES OF AMERICA,

            - against -

ROY AGELOFF,

                    Defendant.
-----------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

98 CR 1129-8 (RJD)

        Scott C. Fenstermaker, Esq. has filed an application seeking reimbursement of attorney's

fees in the amount of $48,871.94, pursuant to Section 2.22(C)(2) of the Criminal Justice Act

("CJA" or the "Act"), for services rendered in connection with his representation of defendant

Roy Ageloff. Specifically, Mr. Fenstermaker seeks compensation for the time and cost of his

services from December 1, 2009 through August 26, 2011. Since the amount exceeds the

statutory maximum of $9,700 for a post-conviction proceeding involving resentencing on the

issue of restitution, the Court must determine whether the application should nonetheless be

granted under 18 U.S.C. § 3006A(d)(3), which permits fees in excess of the statutory maximum

where the case involved "extended or complex representation."

        On September 19, 2011, Mr. Fenstermaker's request for payment was referred to the

undersigned by the Honorable Raymond J. Dearie to prepare a Report and Recommendation.

The Court considers two issues: (1) whether the matters were complex or extended; and (2)

whether the total amount sought is appropriate in order "to provide fair compensation" to Mr.

Fenstermaker within the meaning of the CJA.

        Having thoroughly reviewed the record in this case, it is respectfully recommended that

Mr. Fenstermaker's application for fees and costs be granted in the amount of $34,589.44.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 17, 2000, defendant Roy Ageloff pleaded guilty to one count of racketeering in violation of 18 U.S.C. § 1962(c), stemming from his involvement in a complex stock fraud scheme. United States v. Catoggio, 326 F.3d 323, 324 (2d Cir. 2003). In his plea agreement, Mr. Ageloff consented to an 18 level sentence enhancement due to his participation in a fraud that resulted in losses that exceeded $80 million, the highest loss category under the 1997 Guidelines Manual. Id. at 325.

On August 15, 2001, the Honorable Raymond J. Dearie sentenced Mr. Ageloff to 96 months imprisonment and imposed restitution in the amount of $80 million. (See Docket Entry # 1554 at 1). Subsequently, Ageloff appealed the district court's restitution order. (See Docket Entry # 1210).

On June 2, 2002, while the appeal was pending, the government filed its compilation of the victims' names and their respective losses in its "Restitution Report" (the "Report") (see Docket Entries ## 1285-86), which listed over 9,000 victims and pegged the total amount of the fraud at $190,339,436.65. (See Docket Entry # 1554). On October 15, 2002, Mr. Ageloff filed a motion contesting the government's Report as time-barred under the applicable statute, the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and requested that the Report be stricken. (See Docket Entry # 1326). In an Order dated January 24, 2003, the district court noted that it lacked "jurisdiction to dispose of the matters raised" by defendant "while his appeal is pending before the circuit court." (See Docket Entry # 1336).

On April 16, 2003, the Second Circuit Court of Appeals vacated the district court's

2

restitution order and remanded the case for resentencing solely on the issue of restitution. United States v. Catoggio, 326 F.3d at 328. In granting Ageloff's appeal, the Second Circuit held that "although we believe the victims of Ageloff's fraud are identifiable, the court erred in not identifying them before ordering restitution" as required under the MVRA. Id. The Second Circuit acknowledged that "proceedings to determine the victims and their actual losses are currently under way in the district court" and cautioned that "[w]e do not mean to interrupt those proceedings." Id. at 330. Providing guidance as to the scope of the remand, the Second Circuit instructed that "[t]he district court should simply incorporate the findings from those proceedings into a new restitution order." Id. at 330. Following the Second Circuit's ruling, the district judge understood his task on remand to be "an exceedingly limited one: to compile, and then incorporate into a supplemental restitution order, a list of the names of actually identified victims and the total loss that each victim suffered." (Docket Entry # 1611 at 7).

Despite the remand, no further activity occurred in this case until October 22, 2007, when Mr. Ageloff's defense counsel, Brian Bieber,[1] filed a motion to vacate the restitution order, arguing that "[t]he burden of demonstrating the loss sustained by a victim as a result of the offense shall be on the attorney for the Government." (Docket Entry # 1478 at 6). Counsel argued that since the government had not met this burden, the "unnecessary and inexcusable delay" in resentencing "of approximately 54 months requires th[e] Court to vacate the restitution

---

[1]Mr. Ageloff has been represented by several defense attorneys during this case. Mr. Brian Bieber first appeared on behalf of Mr. Ageloff on September 7, 2007. Although the district court granted Mr. Bieber's Motion to Withdraw as Ageloff's attorney on March 27, 2009, Mr. Bieber continued to represent Ageloff until Mr. Fenstermaker was appointed to replace him on December 2, 2009.

3

order in its entirety."[2]  (Id.)

In January 2009, Mr. Ageloff pleaded guilty in the Middle District of Florida to a charge of conspiracy to commit money laundering in his attempt to hide proceeds from the underlying fraud of which he was convicted in this District. (See Docket Entry # 1574 at 1-2; see also Docket Entry #1574, Ex. 3 at 3). Government agents conducted a search of Mr. Ageloff's Florida property in connection with their money laundering investigation and seized, among other items, an electronic floppy disk, which Ageloff later claimed contained his analysis of the restitution claims. (See Docket Entry # 1549, Ex. A at 2-3).

On December 2, 2009, Mr. Fenstermaker, a member of the CJA panel of the Eastern District of New York, was appointed to represent Mr. Ageloff in connection with his

---

[2]There is no evidence in the record as to whether the motion was decided.  However, a review of the docket sheet and the parties' submissions suggests that the parties were largely responsible for the slow pace at which this case progressed from 2003 to 2009 and the uncertain status of this motion.  Following the Second Circuit's remand in April 2003, on June 1, 2003, defendant submitted a letter to the court in which he requested that the court stay restitution proceedings until the Supreme Court decided whether or not to grant *certiorari*.  (See Docket Entry # 1359).  Subsequently, it does not appear that the government pursued the case against Mr. Ageloff until the court scheduled a status conference on September 7, 2007, during which defense counsel requested time to discuss the case with the government, defendants, and experts. (See Docket Entry # 1477).  On October 26, 2007, the court held the next status conference, at which the parties advised the court that they were in the process of attempting to work out a disposition resolving the restitution issue. (See Docket Entry # 1479).  At the follow-up conference held on December 19, 2007, the parties informed the court that they were "close to a settlement to resolve the outstanding restitution issue." (Docket Entry # 1483).  In fact, it appears that the parties believed they had reached a "settlement agreement" on December 26, 2007. (See Docket Entry # 1512).  As Mr. Bieber later explained, he "settled this restitution matter for the amount of $8 million with former AUSA Suzanne McDermott" but "[s]ubsequently the government contacted [him] and said well, she didn't have authority to settle it." (See Docket Entry # 1627 at 4).  After that December 19, 2007 conference, the government did not resume its pursuit of this case until February 25, 2009, when it submitted a letter detailing "the government's response to the defendant's objections. . . " to the government's restitution calculations. (See Docket Entry # 1511).

4

resentencing on the amount of restitution owed. Based on the CJA 20 Voucher and the attached "In Court" and "Out of Court" hourly timesheets (the "CJA voucher") that Mr. Fenstermaker submitted to this Court on August 26, 2011 requesting reimbursement for his services, he appears to have spent a total of 386.1 hours representing Mr. Ageloff in this case.

The timesheets show that Mr. Fenstermaker spent 5.3 hours in court and 380.8 hours of work performed out of court. According to the timesheets attached to the CJA voucher, this expended out-of-court time breaks down as follows: 87 hours conducting interviews and conferences, including 78.1 hours spent meeting with his client in the pens or at the Metropolitan Detention Center ("MDC") in Brooklyn; 50.2 hours traveling, including 45.9 hours of travel related to 45 trips to the MDC; 47.8 hours performing legal research, including 8.3 hours on unspecified topics, 7.7 hours on "restitution issues," 6.0 hours on "sentencing issues," and 4.7 hours on "28 U.S.C. § 2255 motions;" 44.9 hours drafting letters, including 21.6 hours spent writing to the court; 68.5 hours drafting motions and memoranda; 49.7 hours reviewing documents, including 19.5 hours spent reviewing the case file and 12.0 hours spent reviewing materials from defendant's prior counsel; and 21.0 hours performing miscellaneous investigative and administrative tasks.

In the course of his representation of Mr. Ageloff, Mr. Fenstermaker attacked Mr. Ageloff's sentence, including the issue of restitution, from five angles. The filings and arguments he submitted for each of these five attacks – and the approximate amount of time he spent on them – are detailed below.

5

## A.    Challenging the Data Underlying the Restitution Report

In a letter to the court, dated February 22, 2010, Mr. Fenstermaker asserted that in seeking to determine "whether the Court should sentence Mr. Ageloff to pay restitution, and if so, in what amount," he had discovered that "[t]his task, which at first blush seems to be a simple one, has proven complex." (Docket Entry # 1549 at 1). Mr. Fenstermaker contended that "the information and documentation" necessary to refute the government's claims "if it indeed exists, is within the government's control." (Id.) Accordingly, he outlined three independent written requests for discovery that he had submitted to the government between December 20, 2009, and February 3, 2010, but to which the government had not responded. (See Docket Entry # 1549 at 1-2). The requests sought the identities and complete account histories of every victim, records of any clearing agents, documents reflecting the parking of stocks or securities by brokers in victims' accounts, and complete settlement documentation for all trades for which the government sought restitution. (See Docket Entry # 1549, Ex. A at 2-3). In addition, Mr. Fenstermaker's December 20, 2009 letter requested the return of the electronic floppy disk seized by government agents in Florida. (See Docket Entry # 1549, Ex. A at 2-3).

By oral communication shortly after December 20, 2009, the government informed Mr. Fenstermaker that this information had been previously produced to Mr. Ageloff or was otherwise irrelevant. (See Docket Entry # 1549 at 2). Nevertheless, in a letter dated February 24, 2010, the government furnished Mr. Fenstermaker with a second copy of the "blue sheet"[3] data

---

[3] "Blue sheet" data refers to forms that clearing firms provide to the Securities and Exchange Commission ("SEC"). The blue sheets contain the basic information for each trade, including the names of the parties, the name of the security, the price, the date traded, and the transaction's size. Blue sheets feed into the electronic blue sheet system, which the SEC utilizes for various purposes and regards as a capable enforcement tool. SEC Release 34-44494. See

6

underlying the Restitution Report for all of the house stock purchases and sales executed during the fraud. (See Docket Entry # 1551 at 1). The following day, Mr. Fenstermaker responded by letter, alleging that the government had failed to provide him with the Restitution Report;[4] however, two days later he conceded that he had in fact received the Report. (See Docket Entry # 1552 at 1).

On March 3, 2010, the government submitted a status update to the court in which it classified Mr. Ageloff's voluminous discovery requests as a "distraction from the issues at hand" and argued that the blue sheet data was sufficient evidence to prove the restitution calculations. (See Docket Entry # 1554 at 2). The government also indicated that it was attempting to locate the seized floppy disc, and that it would be provided to the defendant if found. (See Docket Entry # 1554 at 3).

On March 23, 2010, the parties held a status conference before Judge Dearie, during which the court scheduled a hearing for May 17, 2010 to review the government's proof for its claim that Mr. Ageloff should be sentenced to $190 million in restitution. (See Docket Entries ## 1560, 1566). During the conference, Mr. Fenstermaker indicated that he was preparing a motion to dismiss the charges. (See Docket Entry # 1561).

That same day, March 23, 2010, Mr. Fenstermaker, in preparation for the May 17, 2010 hearing, submitted a written request for authorization to retain the expert services of a forensic accountant to review the government's Restitution Report and the underlying blue sheet data.

---

generally 17 C.F.R. § 240.17a-25(b).

[4]As noted supra at 2, the government filed the Restitution Report on June 2, 2002, five years before Mr. Fenstermaker was appointed as counsel.

7

(See Docket Entry # 1558 at 1). On March 26, 2010, the court declared that it would "defer consideration of this request" until Mr. Fenstermaker's "contemplated motion" to dismiss had "been addressed." (Docket Entry # 1561).

On April 5, 2010, Mr. Fenstermaker filed the aforementioned motion to dismiss, which included a request for the release of Mr. Ageloff's legal papers located in storage at FCI Yazoo City, Mississippi. (See Docket Entry # 1567). Although the court had not yet decided the motion to dismiss, Mr. Fenstermaker filed letters on April 7, 2010 and April 19, 2010 that repeated his request for CJA funds to cover expert services, specifically a forensic accountant and a private investigator. (See Docket Entries ## 1568 at 1, 1570 at 1). In addition, the April 7, 2010 letter reiterated the request for the release of the legal papers stored at FCI Yazoo City, Mississippi. (See Docket Entry # 1568 at 1). On April 13, 2010, the court ordered the release of these papers. (See Docket Entry # 1569 at 1).

Between December 20, 2009, when Mr. Fenstermaker sent the government his first document request, and March 23, 2010, when Mr. Fenstermaker submitted his first request for a forensic accountant, Mr. Fenstermaker appears to have spent 84.7 hours performing tasks related to challenging the evidence underlying the government's Restitution Report. This includes 11.2 hours spent drafting the motion for return of property. In addition, Mr. Fenstermaker appears to have spent an additional 2.7 hours drafting the April 7, 2010 and April 19, 2010 letters to the court reiterating his request for CJA funds to cover expert services.

### B.     The Motion to Dismiss

Having originally filed defendant's second motion to dismiss on April 5, 2010, Mr.

8

Fenstermaker resubmitted defendant's second motion to dismiss on April 26, 2010.[5] Through the motion, defendant sought to vacate the August 2001 restitution order and dismiss the resentencing entirely. (See Docket Entry # 1571). Mr. Fenstermaker raised five major arguments in favor of dismissal.

First, Mr. Fenstermaker argued that the government's refusal to produce essential discovery violated Mr. Ageloff's due process rights. (See id., Ex. A at 16). Second, Mr. Fenstermaker argued that the delay violated Mr. Ageloff's right to due process under the Fifth Amendment and his Sixth Amendment speedy trial right to a timely sentence.[6] (See id., Ex. A at 16-17). Third, Mr. Fenstermaker argued that the approximately seven year delay in determining restitution violated the MVRA, 18 U.S.C. § 3664(d)(5), which mandates that the determination of victim losses not exceed 90 days from the date of sentencing.[7] (See id., Ex. A at 18-19). Fourth, Mr. Fenstermaker argued that if the government had informed the defendant that all of its evidence stemmed from the blue sheet data, Mr. Ageloff would have secured additional evidence that is now unavailable because of the lapse of time. (See id., Ex. A at 22). Finally, Mr.

_____

[5] It is unclear why Mr. Fenstermaker refiled the motion to dismiss three weeks later. The contents of both the April 5, 2010 and April 26, 2010 motions, as well as the attached memoranda of law and exhibits, are largely identical. (See Docket Entries ## 1567, 1571). The Court regards the later-filed April 26, 2010 motion as an amendment of the earlier-filed one.

[6] In his April 26, 2010 second motion to dismiss, Mr. Fenstermaker concedes that the Second Circuit had previously held in United States v. Ray, 578 F.3d 184, 199-203 (2d Cir. 2009), that the Sixth Amendment Speedy Trial Clause is not applicable in sentencing matters. (See Docket Entry # 1571 at 13).

[7] Prior defense counsel, Mr. Bieber, admitted in defendant's October 22, 2007 motion to vacate the restitution order that Mr. Ageloff had agreed on the record to let the government provide the required victim information beyond the 90 day period required under the MVRA. (See Docket Entry # 1478 at 2). However, Mr. Bieber argued that this agreement contained an implicit understanding that the delay be a reasonable one. (See id.)

Fenstermaker argued that the government's loss analysis was flawed because the stocks involved in the transactions in question retained residual value, which the government did not consider, and the government failed to account for the portion of the victims' losses that were caused by outside parties, specifically the "short sellers."[8] (See id., Ex. A at 22-24). Therefore, defendant argued that the government had failed to isolate the losses directly caused by Mr. Ageloff, as required under the MVRA. (Id.)

In addition, Mr. Fenstermaker requested CJA funds to hire a forensic accountant and a private investigator to help him challenge the government's identification of victims and calculations of their losses. Mr. Fenstermaker followed the motion to dismiss with a letter to the court, submitted on May 4, 2010, in which he requested payment pursuant to an interim CJA voucher, appointment of a second CJA attorney, additional CJA funds to cover subpoena compliance fees, and a status conference. (See Docket Entry # 1573 at 1-3).

In response to the motion to dismiss, the government submitted a letter on May 6, 2010 in which it asserted, *inter alia*, that defendant's loss causation argument – the assertion that part of the victims' losses were due to the actions of the short sellers and not the defendant – had already been resolved at Mr. Ageloff's sentencing; consequently, the government argued that this was beyond the scope of remand, which the government interpreted as being "limited to the narrow issue of compiling a list of all identified victims and their total loss amounts." (Docket Entry # 1574 at 2). The government also objected to Mr. Ageloff's speedy sentencing argument, noting that in United States v. Catoggio, the Second Circuit clarified that the intent behind the 90

_____

[8] The "short sellers" were investors who were likely the first to uncover Mr. Ageloff's fraud. They sought to generate profits through their knowledge that the prices of Mr. Ageloff's companies' house stocks were overinflated. (See Docket Entry # 1611 at 25).

10

day period to determine restitution was to protect victims, not perpetrators. (See Docket Entry # 1574 at 4) (citing United States v. Catoggio, 326 F.3d at 330).

On May 9, 2010, Mr. Fenstermaker submitted his counter-arguments. (See Docket Entry # 1577 at 1-4). In his letter, he acknowledged that given the applications for court-funded assistance that he had raised without receiving a ruling, "at this stage, it is unreasonable to proceed with the [scheduled] May 17, 2011" evidentiary hearing on the identity of the victims and the amount of their losses. (Id. at 4). Mr. Fenstermaker contended that "this Court's repeated refusal to rule on Mr. Ageloff's applications. . .jeopardize[d] Mr. Ageloff's ability to either present a meaningful challenge [to] the government's proof or to present proof of its own in opposition to the government's restitution claims." (Id.)

According to the CJA voucher, between March 16, 2010, when Mr. Fenstermaker began working on the motion to dismiss, and May 9, 2010, when he submitted defendant's reply, Mr. Fenstermaker appears to have spent a total of 137.8 hours on Mr. Ageloff's representation. Of this total, he indicates that he spent 39.3 hours drafting the motion to dismiss, 33.2 hours traveling to the MDC and meeting with Mr. Ageloff, and 21.9 hours reviewing documents and conducting investigative work. The remaining time was spent researching and writing letters to the court, opposing counsel, and other individuals.


C.    Seeking Release of Funds Deposited with the Court or Withdrawal of Defendant's Plea

On May 11, 2010, less than a week before the scheduled evidentiary hearing, the district court held a conference in which it raised, *sua sponte*, the concern that Mr. Ageloff did not qualify financially for court-appointed counsel due to the millions of dollars in proceeds he had

11

gained from the fraud. (See Docket Entry # 1583 at 2). The court heard argument from Mr. Fenstermaker and ordered a response in writing by the next day.

In his letter response, filed May 12, 2010, Mr. Fenstermaker "request[ed] a full and fair opportunity to rebut the Court's claim that [defendant] has sufficient assets to retain counsel." (See Docket Entry #1578 at 2). The court granted the request, scheduling a hearing for June 1, 2010.

In addition, Mr. Fenstermaker's letter response argued that Mr. Ageloff did in fact "own assets vital to his ability to retain counsel of his choice," but these assets were unavailable due to being "on deposit with the clerk of the court as a result of. . .the Court's August 15, 2001" $80 million restitution order. (Id. at 1). However, counsel argued that because "that order was subsequently overturned by the Second Circuit in United States v. Catoggio," failure to return the funds to Mr. Ageloff now constituted a violation of his Fifth Amendment due process rights and his Sixth Amendment right to the counsel of his choice. (Id.) By letter dated May 18, 2010, Mr. Fenstermaker sought permission to file a formal motion to have the approximately $536,000 on deposit with the Clerk returned to Mr. Ageloff. (See Docket Entry # 1580). On May 19, 2010, the district court issued an Order denying the release of these funds. (See Docket Entry # 1582).

On May 27, 2010, Mr. Fenstermaker filed a letter motion seeking reconsideration of the Court's May 19, 2010 Order. (See Docket Entry # 1586 at 1). In addition to reiterating the previously-raised constitutional claims, Mr. Fenstermaker requested that the deposited funds be released for the purpose of paying counsel fees. (Id.) In support, Mr. Fenstermaker reiterated the argument that the failure to return the funds would constitute a violation of defendant's Fifth and Sixth Amendment rights to due process and counsel of one's choosing because no restitution

12

order was currently in place. (Id.) Although Mr. Fenstermaker conceded that the Sixth Amendment right to counsel does not extend to the use of tainted funds to obtain counsel, he asserted that the government cannot deny a defendant the use of his funds without engaging in a forfeiture proceeding involving an adversarial hearing in which the government satisfies due process by demonstrating, upon probable cause, that the defendant committed the crimes charged and the funds in question are traceable to the alleged fraud. (Id., Ex. 10 at 5). He contended that the government had not followed that procedure here. (Id.)

In the alternative, Mr. Fenstermaker's May 27, 2010 letter motion requested that the court permit defendant to withdraw his plea of guilty or vacate the judgment pursuant to 28 U.S.C. Section 2255. (See id. at 1-2). In support, Mr. Fenstermaker argued that Mr. Ageloff should be permitted to withdraw his guilty plea because the government had committed a Brady violation in failing to provide defendant with materials possessed by the Financial Industry Regulatory Authority ("FINRA") in a timely manner. (See Docket Entry #1586, Memorandum in Support at 3). He also moved on grounds of ineffective assistance of counsel based on prior counsel's failure to discover and utilize the FINRA records. (See id.) On June 1, 2010, the district court held an evidentiary hearing to determine defendant's eligibility for CJA-funded counsel.[9] (See Docket Entry # 1588).

Based on the voucher, between May 10, 2010 and June 1, 2010, Mr. Fenstermaker appears to have spent 60.6 hours researching, writing, and performing other tasks related to the

---

[9]Although the court states in its Minute Entry for this hearing that the "Court will issue a decision shortly," it appears that no formal decision or Order was ever entered. Nevertheless, subsequently, on August 17, 2010 and December 22, 2010, the district court authorized CJA payments for court reporter services in this case.

motion for the release of funds or the withdrawal of Mr. Ageloff's guilty plea. Specifically, Mr. Fenstermaker spent 20.6 hours traveling to and meeting with his client at the MDC, 15.3 hours drafting the motion for the release of funds or the withdrawal of Mr. Ageloff's guilty plea, and 7.5 hours preparing for the June 1, 2010 hearing. The 60.6 hour total also includes time spent on the motion for reconsideration.

## D.   Reasserting Statutory and Constitutional Sentencing Rights

Following the June 1, 2010 hearing, Mr. Fenstermaker filed nine letters, reasserting Mr. Ageloff's right to a speedy sentencing on June 21, 2010 (see Docket Entry # 1590), August 10, 2010 (see Docket Entry # 1597), September 22, 2010 (see Docket Entry # 1601), December 23, 2010 (see Docket Entry # 1604), February 2, 2011 (see Docket Entry # 1606), March 17, 2011 (see Docket Entry #1607), May 3, 2011 (see Docket Entry # 1608), June 12, 2011 (see Docket Entry # 1609), and August 2, 2011. (See Docket Entry # 1610). In addition, Mr. Fenstermaker's letters of December 23, 2010, December 28, 2010, May 3, 2011, and August 2, 2011 included requests for permission to file an interim CJA voucher, asserting that he would have to withdraw from the case if these requests were denied, imperiling Mr. Ageloff's constitutional rights. (See Docket Entries ## 1604, 1605, 1608, 1610). Neither the government nor the court responded to any of these letters.

On August 19, 2011, Judge Dearie issued a Memorandum and Order of Restitution (the "Restitution Order") in which he rejected each of Mr. Fenstermaker's attacks and instead found that the government's Restitution Report "identif[ied] actual victims of the fraudulent scheme spearheaded by Ageloff" and reasonably estimated "the actual losses suffered by these

14

individuals." (Id. at 13). In fact, the court found that the Restitution Report was most likely an "under-inclusive estimate of the victims and their losses." (Id. at 23). The Order (1) denied defendant's motion to dismiss the resentencing or, in the alternative, sentence defendant without restitution; (2) denied defendant's motion to withdraw his guilty plea; (3) denied defendant's motion to strike the Restitution Report; (4) rejected each of defendant's objections to the Report; and (5) adopted, subject to the conditions of the Order, the government's Report, thus ordering defendant to pay the full $190,339,436.65 in restitution. (See Docket Entry # 1611). The court's Order permitted the government to begin distributing the $536,000 that had been deposited with the Clerk of the Court. (Id.)

In addition, recognizing that Mr. Fenstermaker had filed still-pending applications for CJA funds to hire "additional counsel, an expert witness, and a private investigator" to help him develop proof to challenge the government's Restitution Report at an evidentiary hearing that he expected to "last, at a minimum, three months, if we work five days a week,"[10] the court stated that its "issuance of restitution findings. . .has rendered moot Ageloff's request for *additional* CJA funding to prepare for an evidentiary hearing on the question of restitution." (Id. at 27) (emphasis in original). The court acknowledged that the government had "made clear that it stood ready" to call a National Association of Securities Dealers employee to testify "as to how the investor names and loss figures were gathered from the electronic blue sheets" if the court chose to hold an evidentiary hearing. (Id. at 14, n.7). However, the court stated "an evidentiary hearing was not necessary" because "Ageloff was furnished with both the report and the blue

---

[10]This was the evidentiary hearing previously scheduled to begin on May 17, 2010, which was adjourned *sine die* when the court, at the conference held on May 11, 2010, *sua sponte* raised its concerns about Mr. Ageloff's financial eligibility for CJA counsel.

15

sheet data upon which it was based and those materials proved sufficient for him to identify and brief his objections. . . ." (Id.) Supporting its decision to rule on the papers alone, the court concluded that "the parties' copious submissions. . .furnish[ed] an adequate basis for [the court] to rule upon those objections and fashion a restitution order appropriately responsive to the Circuit's mandate." (Id.)

On August 21, 2011, Mr. Fenstermaker submitted a letter to the court objecting to the court's "no-notice, *in absentia*, and uncounselled [*sic*]" sentencing, arguing that the court's procedure violated Mr. Ageloff's "Fifth Amendment right to due process of law, his Sixth Amendment right to confront witnesses against him, and his Sixth Amendment right to counsel." (See Docket Entry # 1612). In addition, citing 18 U.S.C. § 3553(c), Mr. Fenstermaker asserted that the court's manner of sentencing "violated the statutory requirement that the Court 'state in open court the reasons for its imposition of a particular sentence.'" (Id.) Lastly, he argued that the court also violated Rules 32(i)(1)(c) and (i)(4)(A)(I) of the Federal Rules of Criminal Procedure by sentencing Mr. Ageloff *in absentia* and outside the presence of counsel. (Id.) On August 25, 2011, Mr. Fenstermaker filed an appeal of the Restitution Order.

On September 14, 2011, the district court issued its amended judgment, correcting defendant's sentence to incorporate the terms of the Restitution Order. (See Docket Entry # 1617).

Based on the CJA voucher, it appears Mr. Fenstermaker spent 79.7 hours representing Mr. Ageloff between June 4, 2010, when he met with his client after the hearing, and August 25, 2011, when he appealed the Restitution Order. Specifically, Mr. Fenstermaker spent 47.9 hours communicating with his client and his family during this time period; this includes 16 visits to

16

the MDC to meet with his client, each of which necessitated an average of approximately one
hour of travel time. Mr. Fenstermaker also spent 6.7 hours drafting and sending letters sent to
the court and the Assistant United States Attorney; 5.7 hours researching 28 U.S.C § 2255
motions and drafting related letters; 3.5 hours reviewing Mr. Ageloff's Yazoo files; and 15.9
hours on other miscellaneous tasks.

## E.  Staying the Distribution of the Funds on Deposit

Mr. Fenstermaker filed his final motion in this case on October 11, 2011, seeking a
limited stay of the distribution to victims of the $536,000 Mr. Ageloff deposited with the court
until after the Second Circuit ruled on defendant's appeal.[11] (See Docket Entry # 1621). In
addition, the motion sought the release of $30,000 from these funds to allow defendant to retain
private counsel for his appeal. The Honorable John Gleeson reviewed the parties' submissions
on defendant's motion and denied the request, reasoning that "there is virtually no chance that
Ageloff's appeal from the latter decision will result in a reduction in the restitution amount to an
amount less than the $536,000 now on deposit with the Clerk of the Court," and that whatever
small chance existed was "dwarfed by the interest of the numerous victims in this case in
obtaining what little restitution may be available, especially given the passage of time;" therefore,
Judge Gleeson found no basis to stay distribution of the $536,000. (See Docket Entry # 1624).
Judge Gleeson also denied defendant's request to "dip into the limited victim restitution funds to
pay for private appellate representation" because "any diminution of those funds would be
irreconcilable with the findings and tenor of the Restitution Order," which detailed "Ageloff's

---

[11]As of the date of this Report, it appears that the appeal is still pending.

17

determined effort to avoid his restitution obligation." (Id.)

The CJA voucher does not account for any time Mr. Fenstermaker spent representing Mr. Ageloff after August 25, 2011.

## DISCUSSION

### A. Standards for an Award Above the Statutory Maximum

The CJA is designed to provide indigent defendants with adequate legal representation, 18 U.S.C. § 3006A(a); United States v. Calle, 178 F. Supp. 2d 309, 310 (E.D.N.Y. 2001) (citing United States v. Tutino, 419 F. Supp. 246, 248 (S.D.N.Y. 1976)), and authorizes the payment of legal fees to attorneys appointed pursuant to the Act, in order to alleviate the burden of representing indigent defendants. See United States v. Calle, 178 F. Supp. 2d at 310 (citing United States v. Perry, 471 F.2d 1069, 1070 (D.C. Cir. 1972)).

Pursuant to Section 3006A(d)(2), the CJA imposes certain maximum amounts of compensation to be paid for specific tasks. The Judicial Conference of the United States sets rules and regulations for the administration of CJA plans, and these regulations include the setting of maximum compensation. See 18 U.S.C. § 3006A(d)(1) & (2). The maximum award set by the Judicial Conference in their "Guidelines to Administering the CJA and Related Statutes" for post-conviction proceedings under 28 U.S.C. § 2255 is $9,700 for work completed after January 1, 2010.[12] Guide to Judiciary Policy, Vol. 7A, Ch. 2, § 230.23.20. This applies to

---

[12]According to the voucher, Mr. Fenstermaker spent 31.2 hours representing Mr. Ageloff prior to January 1, 2010. For work completed after March 11, 2009 and prior to January 1, 2010, the maximum award set by the Judicial Conference is $8,600. Guide to Judiciary Policy, Vol. 7A, Ch. 2, § 230.23.20. The Guidelines set maximum hourly compensation rates as well. CJA attorneys are limited to a maximum hourly rate of $110 for work performed after March 11, 2009 and prior to January 1, 2010, and a maximum hourly rate of $125 for work performed after

18

the time Mr. Fenstermaker spent in connection with Mr. Ageloff's restitution obligations. Mr. Fenstermaker's vouchers indicate that his work in connection with Ageloff's challenge to the restitution amount was performed between December 2, 2009 and October 20, 2011.

In sum, the CJA authorizes payment of $9,700 for work relating to the post-conviction proceedings. However, Mr. Fenstermaker has requested a total of $48,871.94, well in excess of the total maximum compensation; such excess compensation requires court authorization.[13]

The Court may authorize payment in excess of these maximum amounts if: (1) the representation was extended or complex; (2) the Court certifies that the amount of the excess payment is necessary to provide fair compensation; and (3) the Chief Judge of the Circuit approves it. 18 U.S.C. § 3006A(d)(3).

When applying for reimbursement above the statutory maximum, "CJA counsel must 'submit a detailed memorandum supporting and justifying counsel's claim that the representation given was in an extended or complex case, and that the excess payment is necessary to provide fair compensation.'" United States v. Mukhtaar, No. 06 CR 31, 2008 WL 2151798, at *1 (S.D.N.Y. May 21, 2008) (citing Revised Plan Part IX.A.2). In response to such a request, courts have interpreted the CJA to require a two-step inquiry. Id. at *2. First, the Court must determine whether the representation is extended *or* complex. Second, the Court must determine whether the fees are necessary to provide fair compensation. Id. See also United States v. Bailey, 581

_____

January 1, 2010.

[13]The Court expressed concern regarding the amount of attorney's fees requested and invited Mr. Fenstermaker to explain and elaborate on the information submitted in his vouchers. He did so in a hearing on November 29, 2011, although this Court denied his request to bring 26 boxes of documents to the courthouse to demonstrate the amount of work this case required. (See Docket Entry # 1626).

19

F.2d 984, 989 (D.C. Cir. 1978) ("[E]xcess compensation is to be allowed if, but only if, the legal or factual problems in the case, or the quantity or nature of the service demanded, are 'significantly' greater than average. The point of reference is the case commonly encountered, and the comparison must reveal enough margin of difference to justify a confident conclusion that excess compensation is essential to fairness"). Under the CJA, "fair compensation is often found to mean less than the amount requested." United States v. Mukhtaar, 2008 WL 2151798, at *4 (citing United States v. Blanford, 30 F. Supp. 1080, 1082 (C.D. Ill. 1998)).

"The certification process 'is not one involving a rubber stamp. It is a meaningful, congressionally-mandated step that requires detailed justification not only by the lawyer, but also by the approving judge.'" Id. at 2 (citing United States v. Sepulveda, 502 F. Supp. 2d 1104, 1105 (D. Mont. 2007) (internal citations omitted)). The Court, when calculating the appropriate compensation, must balance the competing policy goals underlying the CJA. Id. On the one hand, representing indigent defendants is a public service, and so "the [CJA] was never intended to provide full compensation for an attorney's services or to provide fees equal to those charged in private practice." Id. (citing United States v. Blanford, 30 F. Supp. at 1081 (internal citations omitted)). On the other hand, the CJA was intended to provide indigent defendants with meaningful representation, which could be undermined by too narrow a construction of the excess compensation provision. Id. (citing United States v. Keeble, No. 03 CR 399, 2008 WL 1792935, at *2 (N. D. Tex. Apr. 16, 2008) and United States v. Bailey, 581 F.2d at 989).

B. Analysis

### 1) Whether the case was extended

Turning to the two-part analysis, any assertion that the case was "extended" is
inconsistent with the law. According to the D.C. Circuit Court of Appeals, extended
representation requires a "substantial investment of time;" however, the time included in the
calculation should be restricted to "reasonably competent and productive effort" and should
exclude "wasteful activity." United States v. Bailey, 581 F.2d at 987. A number of factors are
considered when determining whether a case should be considered extended: "the duration of
the representation, the quantity and nature of the charged offenses, whether the case proceeded to
trial, and whether the attorney faced any other significant challenges during the course of the
representation." United States v. Mukhtaar, 2008 WL 2151798, at *3.

In this case, defendant Roy Ageloff was charged with 16 felonies stemming from his
involvement in a complex stock fraud scheme. (See Docket Entry # 694); see also United States
v. Catoggio, 326 F.3d at 324. While some of Mr. Ageloff's co-defendants proceeded to trial,
Ageloff did not. Instead, on August 17, 2000, prior to Mr. Fenstermaker's appointment, Ageloff
pleaded guilty to one count of racketeering in violation of 18 U.S.C. § 1962(c).

Although this case began on June 10, 1999 when Mr. Ageloff was indicted, Mr.
Fenstermaker has only represented Mr. Ageloff for the approximately two and a half year time
period running from December 2, 2009 to the present. According to the CJA voucher, Mr.
Fenstermaker spent a total of 386.1 hours on the case.

The Court does not question that Mr. Fenstermaker expended numerous hours in pursuit
of Mr. Ageloff's case, nor does the Court dispute that the question of restitution in this case was

more complicated than the vast majority of cases. However, given that the defendant entered a plea and that Mr. Fenstermaker's role was limited to one post-sentencing issue, the Court respectfully recommends that Ageloff's case should not be characterized as "extended" when compared with the sort of cases that have been deemed as such. See, e.g., United States v. Keeble, No. 03 CR 399-D, 2008 WL 1792935, at *1 (N.D. Tex. Apr. 16, 2008) (finding the representation was extended where defendant was charged with threatening to use a weapon of mass destruction and mailing a threatening communication, and it took 2.5 years to determine defendant's competency to stand trial); United States v. Vead, No. 03 CR 422-D(01), 2005 WL 1025798, at *2 (N.D.Tex. Apr. 29, 2005) (finding extended representation where defendant was charged in 16-count superseding indictment with conspiracy and mail fraud that occurred over a three-year period and defense counsel spent substantial amounts of time preparing defenses of diminished mental capacity, coercion, and duress); United States v. Ellzey, 29 F. Supp. 2d 505, 506-07 (C.D. Ill. 1998) (finding representation was extended where defendant was charged with being a member of cocaine conspiracy which spanned several years and included over thirty participants, resulting in a 5-day jury trial).

### 2) Whether the case was complex

Given the determination that the case was not "extended," the Court must still determine whether counsel should receive fees above the statutory maximum because the case was complex. See United States v. Mukhtaar, 2008 WL 2151798, at *2 (citing United States v. Bailey, 581 F.2d at 987 (holding that in evaluating a request for compensation in excess of the statutory maximum, "the representation may be either 'extended or complex;' it need not be

22

both")).

Courts have found that one of the following factors must be present in order to merit a finding of "complex" under the CJA statute: there must be "unusual or difficult legal or factual issues, multi-count indictments, voluminous evidence, and other circumstances, such as numerous or complex defenses, that require a greater than average amount of time or skill in preparing the defense." Keating v. New York, No. 03 CV 1286, 2009 WL 3401756, at *3 (E.D.N.Y. Oct. 21, 2009).

Here, given the number of victims and the amount of transactions involved in the stock fraud scheme, the Court finds that there was not only voluminous evidence to review in connection with the resentencing, but the factual issues were complicated by the loss of the floppy disc and the need to retrieve information that the government had previously provided to Mr. Ageloff. Given these circumstances, the Court respectfully recommends that there be a finding that the matter was "complex" so as to allow for fees above the statutory maximum of $9,700.

### 3) Reasonable compensation

Given the finding that Ageloff's case was complex, the Court must determine a reasonable amount of compensation. In determining what amount to award as "fair compensation," courts have considered the factors in the Guidelines for the Administration of the Criminal Justice Act, which include: "[the] responsibilities involved measured by the magnitude and importance of the case; manner in which duties were performed; knowledge, skill, efficiency, professionalism, and judgment required of and used by counsel; nature of counsel's practice and

23

injury thereto; any extraordinary pressure of time or other factors under which services were rendered; and any other circumstances relevant and material to a determination of a fair and reasonable fee." United States v. Mukhtaar, 2008 WL 2151798, at *5 (citing Admin. Office of U.S. Courts, Guide to Judiciary Policies and Procedures § 2.22(3)).

In examining these factors, the Court notes that although Mr. Fenstermaker doggedly advocated for Mr. Ageloff over the course of the approximately two and a half years he spent representing the defendant, the scope of Mr. Fenstermaker's advocacy was intended to be much more limited and focused than the expansive – and costly – litigation he pursued, for which he now seeks to be compensated out of public funds. In remanding the case for resentencing solely on the issue of restitution, the Second Circuit specifically held that the district court's error was limited to "not identifying [the victims] before ordering restitution," as required under the MVRA. United States v. Catoggio, 326 F.3d at 328. However, the Second Circuit recognized that "proceedings to determine the victims and their actual losses [were] currently under way in the district court," and therefore the Second Circuit instructed that "[t]he district court should simply incorporate the findings from those proceedings into a new restitution order." Id. at 330. Indeed, at the time Judge Dearie issued his final Restitution Order, he made it clear that he understood his task on remand to be "an exceedingly limited one: to compile, and then incorporate into a supplemental restitution order, a list of the names of actually identified victims and the total loss that each victim suffered." (Docket Entry # 1611 at 7).

Mr. Fenstermaker was retained to represent Mr. Ageloff during this resentencing process. His task was to hold the government to its burden of identifying the actual victims and providing an accounting of their individualized losses. Therefore, even though the case was indeed

"complex" due to the number of victims affected, the amount of money at stake, and the intricacy of the transactions involved, the narrow remand limited the scope of Mr. Fenstermaker's role. His efforts should have been focused on reviewing and challenging the victims identified and losses calculated in the government's Restitution Report.

Given these considerations, the Court must determine how much in excess of the statutory maximum compensation Mr. Fenstermaker is entitled to receive for the 386.1 hours he spent on this case. The Court analyzes the reasonableness and quality of Mr. Fenstermaker's litigation efforts according to the factors laid out in United States v. Mukhtaar, 2008 WL 2151798, at *5.

To begin, the Court regards the time Mr. Fenstermaker spent getting up to speed in the case and the time he spent arguing the case in court as necessary and reasonable. Accordingly, applying the statutory maximum hourly rates, the Court respectfully recommends that Mr. Fenstermaker receive $2,497 for the 22.7 hours counsel spent orienting himself to the case,[14] and $942.50 for the 7.6 hours he spent traveling to the courthouse and representing Mr. Ageloff in court on December 2, 2009, January 27, 2010, March 23, 2010, May 11, 2010, and June 1, 2010. In addition, Mr. Fenstermaker appears to have spent 12.0 hours responding to Judge Dearie's *sua sponte* challenge to Mr. Ageloff's financial eligibility for CJA counsel. Given that Mr. Fenstermaker could not have proceeded in his representation without addressing this fundamental question, the Court respectfully recommends that Mr. Fenstermaker be fully compensated for this

---

[14]According to the timesheets, Mr. Fenstermaker spent approximately 22.7 hours between December 1, 2009 and December 19, 2009, getting up to speed on the case by meeting with his client, reviewing materials, exchanging letters with his client, and discussing the case on the phone with his predecessor and the government.

25

time and awarded $1,500 for the hours he spent performing research, drafting letters, and preparing for the June 1, 2010 hearing on the issue.

As for the remaining 343.8 out-of-court hours Mr. Fenstermaker spent on Mr. Ageloff's case, for which he seeks $42,847.50 in compensation, the Court notes that the timesheets attached to the CJA voucher suggest[15] that only a small portion of this time was dedicated to challenging the names and amounts in the Restitution Report. On this front, Mr. Fenstermaker's primary efforts involved attempts to develop proof by filing letters and discovery motions seeking, among other things, account histories for every victim and settlement documentation for every trade for which the government sought restitution, the return of a floppy disc seized by government agents as part of Mr. Ageloff's Florida money laundering conviction, and the release of Mr. Ageloff's legal papers stored at FCI Yazoo City, Mississippi. Counsel also filed a subpoena for FINRA records. In addition, he repeatedly requested – though never received – additional CJA funding to hire a second attorney, a private investigator, and a forensic accountant to help him analyze the blue sheet data and the voluminous financial documents in order to

---

[15]The Court finds many of Mr. Fenstermaker's timesheet entries problematically vague. For example, Mr. Fenstermaker claims to have spent 8.3 hours conducting unspecified "research," 7.7 hours researching "restitution issues," 6.0 hours researching "sentencing issues," 4.8 hours drafting a "memorandum of law" on an unspecified topic, and 2.0 hours "review[ing] documents in preparation for drafting the motion to dismiss." These entries do not provide enough information for the Court to assess the reasonableness and quality of these activities. Similarly, there is no way to determine what was discussed or accomplished during any of the 78.1 hours Mr. Fenstermaker spent meeting with Mr. Ageloff; what was communicated in any of the letters that Mr. Fenstermaker spent 23.3 hours drafting and which were sent to parties other than the court; or whether all of the 19.5 hours he spent reviewing the case file and the 12.0 hours he spent reviewing materials from prior counsel were necessary and used efficiently. Given the many vague explanations of how he spent his time, the Court cannot endorse fully compensating Mr. Fenstermaker for the extraordinary number of hours he spent on this case.

26

prepare for an evidentiary hearing on the Restitution Report.[16] Mr. Fenstermaker appears to have spent approximately 26.2 hours on these discovery efforts, accounting for $3,257 of his requested fees.

Nevertheless, it does not appear from the CJA voucher timesheets that Mr. Fenstermaker ever undertook a name by name, account by account analysis of the victims and losses designated in the government's Restitution Report. Instead of focusing on the core task for which he was assigned as counsel, Mr. Fenstermaker's only attacks on the loss amounts in the Restitution Report were two global challenges to the government's loss calculation methodology that were raised in the motion to dismiss, filed on April 26, 2010.

First, Mr. Fenstermaker argued in his motion to dismiss that when the government raided and closed down Mr. Ageloff's brokerage firm, the fraudulent house stocks at the center of Mr. Ageloff's scheme nevertheless held some residual value on the market for a short time. Therefore, Mr. Fenstermaker argued that the government's loss calculations, which valued these unsold house stocks sitting in victims' accounts as essentially worthless, were flawed. However, this argument had been made by prior counsel at the time of the initial sentencing and had been rejected at that time. Indeed, in its August 19, 2011 Restitution Order, the district court, in rejecting this argument for a second time, noted that this valuation argument was one that Ageloff had already advanced at sentencing. The court further noted that it had "already rejected [this position] with the Circuit's approval and nothing in the Catoggio decision authorizes

---

[16]As discussed supra at 11, this hearing was originally scheduled for May 17, 2010, but was adjourned indefinitely while the court took up the question of Mr. Ageloff's eligibility for CJA counsel. The court did not rule on Mr. Fenstermaker's requests for additional CJA funding until declaring them moot in its August 19, 2011 Order adopting the Restitution Report.

27

Ageloff to reopen the question here." (Id. at 17-18). Moreover, even assuming *arguendo* that the matter should be revisited, the court rejected this valuation objection on its merits as well, stating that "the [unsold] house stocks in question were essentially worthless because the [underlying fraudulent] companies themselves were worthless." (Id. at 16). Given the court's prior rejection of the same argument and the limited scope of the remand, the Court finds that the time Mr. Fenstermaker expended on this argument was not well spent.

Second, defendant's motion to dismiss argued that the government's loss calculations overstated the number of victims and their actual losses because the Restitution Report "contains fictitious trades and accounts" that were made by brokers in "dummy accounts" in order to "paint a false picture of activities in a particular stock" to investors. (Id. at 20) (internal quotation omitted). According to Mr. Fenstermaker's argument, the total of such fictitious losses exceeded $80 million, which meant that counsel claimed that more than 40% of the losses in the government's report were fake and victimless. (Id.) However, the court eviscerated this "fantastical assertion" as "yet another of [defendant's] tactical, disingenuous efforts" to convince the court that restitution proceedings were too complex or burdensome to undertake, and thus Mr. Ageloff should be excused from paying restitution at all. (Id.) The court also debunked this claim on its merits as well, noting that the stock purchases in the government's Restitution Report were all "settled trades" where "money was exchanged between the buyer and seller," and thus not fictitious at all.[17] (Id.)

---

[17]Nevertheless, "in an abundance of caution," the court instituted a safeguard process whereby as a condition of receiving a restitution payout, a victim would have to certify under penalty of perjury that he or she is the person identified in the Report and that he or she actually sustained the losses indicated; in addition, the victim would have to provide details of any recovery from another source and have the restitution payout offset by that amount. (Id. at 21).

The Court notes that over the course of the two and a half years Mr. Fenstermaker spent representing Mr. Ageloff, the timesheets indicate that counsel met with his client 47 times either in the pens or at the MDC, spanning a total of 78.1 hours, and spent 47.9 hours traveling to those meetings. In addition, Mr. Fenstermaker spent an additional 5.4 hours corresponding via telephone and e-mail with his client and Mr. Ageloff's family. Applying the appropriate statutory maximums, these meetings, communications, and travel represent $16,215 of Mr. Fenstermaker's $48,871.94 fee request. While it might have been necessary for Mr. Fenstermaker to travel to meet with his client face to face 47 times to produce a name by name, account by account, loss by loss challenge to the government's Restitution Report, the Court again notes that Mr. Fenstermaker never produced any such document. Instead, counsel's filings consisted almost entirely of legal arguments attacking the basis of the resentencing.

Mr. Fenstermaker spent the majority of his time in this case – and half of the motion to dismiss, which was his most substantial filing – on research, communications, and filings seeking to void Mr. Ageloff's obligation to pay restitution entirely. These challenges reached beyond the scope of the mandate for which CJA counsel was authorized and for which he was assigned. Indeed, the district court stated that "the bulk of Ageloff's objections to the Restitution Report are. . .'at best a disingenuous effort to avoid a consequence of his criminal behavior.'" (Aug. 19 Ord.[18] at 14) (quoting United States v. Catoggio, 326 F.3d at 328). In fact, the court found that the majority of Mr. Fenstermaker's attacks were "a rehashing of arguments that [the court had] previously found to be meritless and. . .beyond the scope of the limited mandate, or

---

[18]Citations to "Aug. 19 Ord." refer to the Memorandum and Order of Restitution issued by Judge Dearie on August 19, 2011.

29

frivolous on their face."[19] (Id. at 24).

The district court noted that Ageloff's "principal" objection to the government's

calculations, to which the rest were "all bootstrapped, . . .is the most preposterous of them all:

even in the face of his plea allocution, Ageloff objects to the Restitution Report on the ground

that the government has not proven that even one investor suffered any loss as a result of [his]

conduct or misconduct." (Id. at 26) (internal quotation omitted). Indeed, in his May 17, 2010

Order scheduling an evidentiary hearing on the question of Mr. Ageloff's eligibility for CJA

counsel, Judge Dearie described the state of the case as follows:

> In its simplest terms, the defendant pleaded guilty in this Court to
> conspiracy to conduct a massive securities fraud which netted the
> defendant and others a sum that the government has calculated as
> approaching $200 million. The defendant has conceded that
> victims' losses exceeded $80 million. He has also acknowledged
> that he was one of two leaders and managers of the racketeering
> enterprise to benefit from the fraud – indeed, during the period of
> the conspiracy he filed tax returns declaring earnings in excess of
> $15 million. Since his conviction in this district, he has pleaded
> guilty to conspiracy to commit money laundering in the Middle
> District of Florida and has admitted under oath that he sought to
> conceal assets from the government to avoid paying restitution to
> the more than 9,000 victims of the scheme.

Consequently, after discussing the litany of evidence refuting the claim that the government had

failed to prove that the investors' losses were due to Mr. Ageloff's actions, the court stated in the

---

[19] The Order specifically singles out as "myopic" the "now familiar refrain" that the short
sellers, and not Mr. Ageloff, were to blame for the losses suffered by the victims of Mr.
Ageloff's fraud, therefore eliminating his obligation to pay restitution; this was an argument that
the court "reject[ed]. . .at the time of sentencing." (Id. at 24). In addition, because the court held
that "the actions of the short sellers do not diminish Ageloff's culpability," the court also ruled
that the FINRA records (see supra at 13) were not Brady material. (Id. at 36). It is unclear from
the timesheets exactly how much time Mr. Fenstermaker spent on these arguments that the court
found to be meritless, but these same arguments appear in several of his filings.

Restitution Order that "[m]y one clear sentencing error, and deep regret, is that I allowed Ageloff a three-level adjustment for acceptance of responsibility." (Id.)

Mr. Fenstermaker repeatedly challenged the resentencing on constitutional and statutory due process grounds, arguing that Mr. Ageloff was entitled to have his sentence reduced or his guilty plea vacated due to the time that elapsed between the remand and the resentencing. Indeed, he spent 4.7 hours researching "28 U.S.C. § 2255 motions," 1.8 hours researching "Restitution and constitutional speedy trial issues," 1.3 hours researching "5th and 6th Amendment issues," and 0.4 hours researching "Restitution time frames," as well as 39.3 hours drafting the aforementioned motion to dismiss and 3.5 hours drafting nine letters sent to Judge Dearie between June 21, 2010 and August 2, 2011, each of which reasserted Mr. Ageloff's right to a speedy sentencing.[20] In its Restitution Order, the district court dismissed these constitutional and statutory due process arguments as frivolous.[21]

Furthermore, in addition to rejecting each of the arguments counsel raised in the motion to dismiss, the Restitution Order addressed the applications Mr. Fenstermaker raised in his other filings, specifically his attempt to withdraw Mr. Ageloff's guilty plea, and his allegation that the defendant had received ineffective assistance of counsel. The Restitution Order dismissed these

---

[20]The last six of these letters – those dated December 23, 2010, February 2, 2011, March 17, 2011, May 3, 2011, June 12, 2011, and August 2, 2011 – are almost verbatim copies of each other. Nevertheless, Mr. Fenstermaker claims it took him three hours to write and file these six nearly identical letters.

[21]In addition, Mr. Fenstermaker spent 13.1 hours researching, drafting, filing, and serving a petition for writ of mandamus, asking the Second Circuit to direct the district court to consider Mr. Ageloff's October 22, 2007 motion to vacate, his March 23, 2010, April 5,2010, April 7, 2010, and April 19, 2010 applications for the appointment of expert services, and his motion to dismiss the pending restitution resentencing. The Second Circuit denied the motion. (See Docket Entry # 1587).

contentions as frivolous as well. Given that these challenges to Mr. Ageloff's plea and the length of his sentence were beyond the scope of the limited remand, and given the court's findings as to the merits of these arguments, this Court finds that it is inappropriate to fully compensate Mr. Fenstermaker for the substantial time he spent on them. See United States v. Mukhtaar, 2008 WL 2151798, at *5.

Based on the vague descriptions in Mr. Fenstermaker's CJA voucher and the attached timesheets, his failure to produce a name by name, loss by loss challenge to the government's Restitution Report, which was the primary task for which he was assigned, the excessive time spent traveling to the MDC and meeting with Mr. Ageloff in person in light of what was filed, and the extensive time he spent pursuing frivolous and previously rejected arguments, the Court does not find Mr. Fenstermaker's fee request to be reasonable. When the court authorized CJA counsel for Mr. Ageloff for this resentencing process, it did not grant Mr. Ageloff – and, by extension, Mr. Fenstermaker – license to relitigate the entire case or to attack the basis for Mr. Ageloff's conviction or sentence, especially given that Mr. Ageloff pleaded guilty. Accordingly, the Court respectfully recommends that Mr. Fenstermaker's compensation for the remaining 343.8 hours – those that were not spent getting up to speed on the case, representing Mr. Ageloff in court, or responding to Judge Dearie's *sua sponte* challenge to Mr. Ageloff's financial eligibility for CJA counsel – be reduced by 33%. Based on the statutory maximum hourly rate of $125, this results in an additional $28,565 in fees awarded.

The Court is mindful of the fact that the CJA Fund is not without limit and fees must be allocated in a manner that ensures that all defendants who are qualified to receive CJA counsel receive appropriate representation. If courts fail to scrutinize requests for fees, and simply award

32

the amounts requested, there will be significantly reduced funds available to support the defense of other defendants who come before the court.

Moreover, since the maximum amount allowable is stated in the statute itself, counsel should have realized that there might be limits placed on the award and adjusted the work accordingly, or contacted the Court for guidance. Had counsel exercised the judgment to focus only on the narrow issue raised by the Second Circuit's remand – specifically the government's need to identify each victim and the corresponding loss that the victims suffered – he could have spent far less time on this case while still providing appropriate services and representation. Therefore, the Court respectfully recommends that Mr. Fenstermaker be compensated for a total of $33,504.50 in attorney's fees. In addition, the Court recommends that Mr. Fenstermaker be reimbursed for the full amount of costs he requested, $1,084.94, bringing his total compensation to $34,589.44.

## CONCLUSION

The Court respectfully recommends that Mr. Fenstermaker should be awarded $34,589.44 in attorney's fees and expenses.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

33

The Clerk is directed to send copies of this Report and Recommendation to the parties

either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
June 7, 2012

/s/ CHERYL POLLAK

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

34